HELEN A. KEMPSON

v.

ST. GEORGE KEMPSON.

[Submitted February 4th, 1901. Decided February 9th, 1901.
Filed June 4th, 1901.]

1. Defendant was conducting business in two places in the state, at one of which his family resided, and he had another business and office in another state, at which he spent considerable time, but only slept there occasionally when business was pressing, and did not give up his domicile in the first state, and while so doing commenced divorce proceedings against his wife in the North Dakota courts. His wife obtained an injunction restraining him from procuring such divorce, which was served on him outside the state, and, a subpœna being returned unserved on account of not found, jurisdiction was obtained by publication, and service was made on him by mail.—*Held*, that the court had such jurisdiction of the person of defendant as to empower it to enjoin his procuring a divorce.

. 2. Where defendant had been enjoined from procuring a divorce, and had notice, no matter how obtained, that the injunction had been issued, he is liable for contempt for violating it to the same extent as if it had actually been served on him in writing.

3. Plaintiff, after obtaining an injunction restraining her husband from procuring a divorce, took charge of a business, the stock of which stood in her name, notifying persons of such change by advertisement, but he induced her to return it to him, so that it could be properly managed, at the same time inducing her to sign papers giving him charge of the business. One of these, which she supposed pertained only to the business, directed her attorney to cease all lawsuits against defendant. On receiving a letter the next day from her attorney regarding the matter, she revoked the letter by telegram. Plaintiff also, at defendant's dictation, wrote to an attorney in North Dakota, where the divorce action was pending, who had voluntarily written to her advising an appearance, directing him to appear for her, but two days later she revoked the authority, and he did not appear. Defendant promised to drop the divorce proceedings and cease his attentions to a clerk in his office, and then resumed his former relations with his wife, living with her as much as he had previously, for several months, and up to almost the time of procuring a divorce.—*Held*, that defendant by procuring a divorce was guilty of contempt.

4. Where an injunction had issued restraining a resident of New Jersey from procuring a divorce in North Dakota, which he had violated

Kempson v. Kempson.

by procuring the divorce, plaintiff, by accepting the weekly alimony ordered by the decree for several months, and endorsing the checks therefor drawn by defendant, on which was written, "In accordance with decree of divorce of North Dakota," during which time he was without the state, and by delaying for several months to prosecute for the contempt, did not ratify the divorce, and estop herself from the right to prosecute, since the money received was no more than she was entitled to as the wife of defendant, and he, having married again before any of the payments were made, had not changed his position on the strength of her conduct.

5. Where defendant, in New Jersey, was enjoined from procuring a divorce in North Dakota, but in defiance of the injunction procured the divorce and married again, he will be compelled, in contempt proceedings, to pay a fine to the state, and to take proper measures to undo the contemptuous act by having the decree opened and set aside.

On motion to punish for contempt.

*Mr. Alan H. Strong,* for the motion.

*Mr. Robert Adrain, contra.*

PITNEY, V. C.

The parties are husband and wife, and were married in 1882, and up to January 1st, 1898, had always lived together as man and wife in the State of New Jersey, residing either at Perth Amboy or at Metuchen, both in Middlesex county. The complainant has borne the defendant nine children, the youngest of whom was born in January, 1898.

The husband was engaged in publishing two or three newspapers at Perth Amboy and Metuchen, and also in editing and publishing an insurance journal in the city of New York. He had an office in a building, No. 173 Broadway, on the northwest corner of Cortlandt street and Broadway. The conduct of the insurance journal carried him away from home a great deal, but he maintained his wife and family and home, as above stated, either at Perth Amboy or Metuchen. In the years 1898 and 1899 it was at Metuchen.

On March 29th, 1899, he commenced a suit in the district court of the fourth judicial district in the county of Richland, North Dakota, against his wife for divorce from the bonds of

Kempson v. Kempson.

matrimony, and caused the complaint and summons therein to be served upon his wife at their residence at Metuchen on the 4th of April, such service being made by a Mr. Bennett, of New York City.

On April 10th, 1899, the complainant herein exhibited to a vice-chancellor her bill in this cause, with affidavits annexed, setting forth the commencement, by the defendant herein, of the divorce proceedings in North Dakota, and that her husband had no residence whatever in that state, and other facts and circumstances, with a prayer for an injunction against his proceeding therein, upon consideration of which the vice-chancellor, on that day, advised an order that the defendant show cause, at the chancery chambers, in Jersey City, on the 24th day of April then instant, at ten o'clock in the forenoon, why an injunction should not issue according to the prayer of the bill. The order contained this further clause:

"That the defendant, his counsel, attorneys or agents, in the meantime, and until the further order of this court in the premises, desist and refrain from all further proceedings in the action instituted by him against the complainant in the district court, &c., of North Dakota to obtain a divorce from the bonds of matrimony, and from commencing or prosecuting any other proceedings to obtain a divorce in said state."

The order contained leave to serve it upon the defendant wherever he might be found.

The bill asked for no relief except an injunction against the Dakota suit.

On April 24th, the return day of the order, an affidavit was filed, made by John B. Martin (since deceased) before a notary public of New Jersey, in which he swears that, on the 22d day of April, 1899, he served a true copy of the bill and affidavits and of the said order to show cause in the above-entitled cause upon the defendant, St. George Kempson, by handing the same to him at his office, No. 173 Broadway, in the city of New York.

I stop here to say that the evidence shows clearly enough that the insertion of the words "twenty-second" in that affidavit was a mistake. That the time when it was served, if at all, was the 21st of April.

20

Kempson v. Kempson.

Also, at that time, one Silas H. Dalrymple made affidavit that he served a copy of the bill and affidavits and order to show cause upon the firm of Bessie & Bennett, attorneys for the defendant, Kempson, in his suit against complainant in North Dakota, by serving the same upon Mr. Bennett personally at his office, No. 145 Nassau street, in the city of New York. It will be remembered that it was Mr. Bennett who served the Dakota papers on Mrs. Kempson. But no other proof was made of the fact that Bennett was the partner of Bessie, who alone, so far as the record shows, appeared in the Dakota court.

After consideration, on the 26th of April, as of the 24th, it was ordered that an injunction do issue. The reasons for that are reported in *Kempson* v. *Kempson, 13 Dick. Ch. Rep. 94.*

On the 28th of April, 1899, an injunction was issued, endorsed by the clerk that it was returnable on the 29th of May, 1899. On that day, an order was made in the cause extending the time of service, and in pursuance of that, the endorsed date of the return was changed from May 29th to June 12th.

Annexed to the original injunction on file is an affidavit made by Christopher Meshrow, of Perth Amboy, to the effect that he served the writ of injunction on Mr. Bennett, of the firm of Bessie & Bennett, on the 1st day of May, 1899, and that, on the 31st day of May, he served the writ upon the defendant at his office, No. 173 Broadway, New York, by showing him the original and handing him a certified copy thereof.

A subpœna was issued in that suit on April 25th, 1899, returnable May 8th, 1899, and returned not served, and an order of publication was taken May 9th, 1899, returnable July 10th, 1899. Proper proof is made by affidavit of publication of a proper notice in the newspaper mentioned, and also proof by the solicitor of the complainant that he had made inquiry for the residence and post-office address of the defendant, and that he found that his post-office address was No. 173 Broadway, New York City, and that he mailed a notice to him in proper form and in proper time.

No decree *pro confesso* appears to have been taken or appearance entered in the cause.

On November 26th, 1900, the complainant presented a peti-

tion in the cause setting forth the former proceedings, and that, notwithstanding the injunction of this court, the defendant had proceeded and had obtained a decree for absolute divorce against the complainant in the court at Wahpeton, North Dakota, on October 4th, 1899, and prayed an attachment against the defendant for contempt in disobeying the injunction, and for leave to file a supplemental bill. Thereupon, on the same 26th day of November, an order was made that an attachment against the defendant do issue, and that it be endorsed for bail in the sum of $3,000, and that the complainant have leave to file a supplemental bill as prayed. An attachment was duly issued, the defendant arrested, and, being unable to give bail, he was retained in custody by the sheriff of Middlesex county.

On December 18th an order was obtained by complainant to file interrogatories, and they were filed accordingly, and duly answered. The substance of the answers was that defendant denies that he was served with a copy of the order to show cause, why an injunction should not issue; and he denies that he was served with a copy of the injunction, or shown the original. He admits that he had heard of the injunction not long after it was issued, by common rumor on the street, and that he proceeded and obtained a decree.

Proofs were then entered into before a master to contradict the answer of the defendant, and upon those proofs and the pleadings, affidavits and other papers on file in the cause, which latter were distinctly offered and received in evidence at the hearing, the motion came on to be heard.

The counsel for the defendant, in a masterly argument, presented three grounds for the discharge of his client:

*First.* That the defendant was not served with either the order to show cause or the injunction, and that such notice as he actually had of it was not sufficient to place him in contempt for failure to obey it.

*Second.* That jurisdiction of his person was never obtained by service of process within the state, and hence service of either the order or writ, or both, out of the state was a mere nullity, because the court had acquired no jurisdiction to make any order against him.

Kempson v. Kempson.

*Third.* That the complainant, in fact, waived her rights under the injunction, directed the present suit to be discontinued and consented that the Dakota suit should proceed.

The learned counsel seemed not to rely with much confidence upon the second ground. It, however, involves an important question, and has received careful consideration. In determining it I think it important to ascertain the *status* of the citizenship of the defendant in April and May, 1899, the time of filing the bill and taking the proceedings in question.

The affidavits annexed to the bill, taken in connection with the facts elicited by the examinations before the master for the purpose of the present application, tend strongly to show that the defendant had not lost his previously-acquired domicile in this state—had not acquired any new domicile. The evidence in favor of such change of domicile is no stronger than that in the *Streitwolf Case,* dealt with by me and by the court of errors and appeals, as reported in *13 Dick. Ch. Rep. 563.* It was not as strong as that in the *Dumont Case,* reported in *45 Atl. Rep. 177;* for in the latter case the husband actually remained in Dakota, plying his trade as a jeweler, during the three months required to give the court jurisdiction. Here the defendant's business and business interests were all in New Jersey and New York City. His domicile was, as we have seen, in New Jersey. He had an office in the city of New York, where he sometimes slept when the exigencies of his business required it. His business also required much travel and frequent visits to distant cities. He never changed or abandoned his business, or any part of it; made no arrangements for permanent absence, and, although he was not within reach of personal service when process of subpœna was issued, he was in New York City, at his office there, and was in this state more or less during the currency of the three months from December 29th, 1898, to March 29th, 1899, which constituted the three months' residence in Dakota upon which his right to proceed there was based. And then he substantially admits that his object in going to Dakota was to take advantage of its easy laws on the subject of divorce, and within a few weeks after his decree was made he married another woman.

Kempson *v.* Kempson.

It is desirable, however, not to come to any settled conclusion upon this point, since it may be the subject of further investigation and determination.   It is enough for present purposes to say that I think that, upon the case as it is now presented, the defendant, in the spring of 1899, had his domicile in New Jersey, though his actual temporary residence may have been, for the purpose of service of subpœna in this cause, in New York City.   I am by no means certain, however, that a service of process at his residence in Metuchen, in a suit other than the present, would have been held inefficient to obtain jurisdiction of his person.

The next important matter to be considered is the character of the · suit.   It concerns the marital relations of the parties, and hence is a proceeding in the nature of a proceeding *in rem.*  Says Chancellor Zabriskie, in *Coddington* v. *Coddington, 5 C. E. Gr. 263* (at *p. 264*) :

"Proceedings with regard to the validity or dissolution of marriage are, as was held in the celebrated case of the Duchess of Kingston, proceedings *in rem.*   They actually operate upon the matter; they affirm, constitute or dissolve the marriage relation.   By the well-settled principles of the *jus gentium,* or rules acknowledged by the codes of all civilized nations, and given effect by comity of law, when not controlled by positive enactments, the positive and relative *status* of every person is regulated by the law of domicile."

And Mr. Justice Adams, speaking for the court of errors and appeals, in *Hervey* v. *Hervey, 11 Dick. Ch. Rep. 424* (at *p. 428*), says:   "The regulation of the institution of marriage is a matter of high public policy.   The persons subject to this regulation are, naturally, and by general law, those who are domiciled within the borders of the state.   Specifically, they are those who have therein such a domicile as the state may positively prescribe."

And see, in this connection, *Felt* v. *Felt, 12 Dick. Ch. Rep. 101; S. C. on appeal, 14 Dick. Ch. Rep. 606.*

The difference between the present suit and one for divorce is that the object of the one is to preserve and of the other to destroy the marital relation; and I think that the one for

preservation is quite as clearly within the spirit and reason of the rule laid down by Chancellor Zabriskie and Mr. Justice Adams as that for the destruction of that relation. It is true that, when the defendant's domicile is in another state, although a valid decree for divorce may be made against him by the courts of this state, based upon service of process out of its territorial jurisdiction, yet no decree *in personam* for alimony can in such case be made. *Elmendorf* v. *Elmendorf, 13 Dick. Ch. Rep. 113.* But that case differs from this in that the defendant here did not have a foreign domicile, and no decree *in personam* is asked. The case differs also from *Hervey* v. *Hervey, 11 Dick. Ch. Rep. 166; S. C. on appeal, 11 Dick. Ch. Rep. 425,* in that here there is not only no attempt to obtain a decree for money, but that the complainant has pursued the statutory mode of obtaining jurisdiction—first, by the prompt issue of a subpœna, and second, upon its return not found, by publication and serving notice by mail in such manner that I am satisfied that it reached the defendant? In fact, this was not denied at the hearing. And see *Dean* v. *Bonnell, 4 N. J. L. J. 348 (per Vice-Chancellor Dodd).*

It seems to me that where the spouses are both domiciled in this state, and one of them seeks to destroy the marriage relation by a suit in a foreign jurisdiction, the right of this court, at the instance of the one who desires to preserve it against the other, to protect the marriage relation by its extraordinary process, although it is unable to make service of its jurisdictional process within the state, is quite as clear as it would be to use such extraordinary process against a party who was threatening to inflict irremediable mischief on ordinary visible property situate within the state, although it may be powerless to serve him with jurisdictional process within the state. The spouse who is domiciled in the state, and who fears irremediable mischief to the marriage relation, is as much entitled to judicial protection as the owner of ordinary property situate within the state.

For these reasons I am of the opinion that the court acquired such jurisdiction of the person of the defendant as to empower

it to control his actions, with respect to his marriage relations,⟩
by its writ of injunction.

With regard to the actual service of the writ out of the juris-
diction: It seems to be well settled that it is a matter of no
consequence how the fact of the issuing of the injunction is
brought to the knowledge or notice of the defendant. If he
has notice or knowledge of it, his conscience is bound, and he
is liable to the consequences of its breach to the same extent
as if it had been actually served upon him in writing. The
authorities on the subject in this state are *Corey* v. *Voorhies,
1 Gr. Ch. 5 (Chancellor Pennington); Haring* v. *Kauffman, 2
Beas. 397 (Chancellor Green); Endicott* v. *Mathis, 1 Stock.
110 (Chancellor Williamson); Cape May Railroad Co.* v. *John-
son, 8 Stew. Eq. 422 (Vice-Chancellor Van Fleet); State* v.
*Dwyer, 12 Vr. 93 (Mr. Justice Depue)*, and *Seyfert* v. *Edison,
18 Vr. 428* (at *p. 433*). These authorities abundantly sustain
the position that the service of an injunction may be made with-
out the jurisdiction, and that mere knowledge by the party of
the existence of the injunction is sufficient, without any actual
service, to put him in contempt for its violation.

This brings us back to the first question: Was the restraining
order and injunction, or either of them, served upon or brought
to the notice or knowledge of the defendant?

First, with regard to the *order:* Mr. Martin, who made that
service, is dead. His affidavit is full and complete. He was
well acquainted with the defendant, having married the sister
of the complainant.

The defendant's account of the transaction is that Martin
came to his office in New York City about the day mentioned—
April 21st—and greeted him in a friendly way, and appeared
at once to have been drinking; that the defendant offered him
further drink from a bottle of spirits which he had in his office,
and after its contents were exhausted, with the result that Mr.
Martin's exhilaration was increased, he invited him to lunch
with him in a restaurant in Cortlandt street, just across the
way from his office; that they went over there and indulged in
further intoxicants, and, as the defendant expressed it, a nibble
of lunch, until Mr. Martin was thoroughly intoxicated; that

some time in the course of the debauch Martin said that he had some errand with the defendant, but he had really. forgotten what it was.

In contradiction of this story, but before it was given, a Mr. Pickersgill is sworn. He is a printer and publisher in Perth Amboy, and, to some degree, a rival in business of the defendant, but had done printing for him. The business establishment of the defendant, it appears, was owned by a corporation, the stock of which, as stated by counsel, stood in the name of the complainant, and, after bringing this suit and failure to serve the defendant with process of subpœna, she, as stated by counsel, took some legal proceedings to obtain possession, as proprietor, of the printing establishment at Perth Amboy, and conducted the business, and employed her brother-in-law, Mr. Pickersgill, to superintend it. On the postponed return day of the writ—June 12th—the defendant came to Metuchen, sought an interview with his wife, and obtained from her some documents (which will be more fully noticed hereafter) and proceeded to obtain possession of his printing establishment. This brought him in contact with Mr. Pickersgill. He had two or three interviews with him, one on Friday, June 16th, at which a Mr. Gaynor, of New York, was present, and in which he induced Mr. Pickersgill to abandon possession, and another early the following week, in which he sought from Mr. Pickersgill the possession of certain papers, at which Mr. Gaynor was not present. At the latter interview Mr. Pickersgill testifies that quite an extended conversation took place between him and the defendant, in which the defendant related to him, in detail, the circumstances of the serivce of the order (with. it is proper to add here, a copy of the bill and affidavits). He said that Martin came to him and served a paper on him, and then afterwards they went over to the restaurant in Cortlandt street and had refreshments, both liquid and solid.

The .defendant, as we have seen, denies Pickersgill's account of this interview. Not only do I know no reason why I should not believe Mr. Pickersgill in confirmation of Mr. Martin's affidavit, but the defendant declares that every interview he had with Pickersgill was of the most angry and violent char-

Kempson *v.* Kempson.

acter, and that he made no mention whatever to him of Martin's attempted service. If so, then how did Mr. Pickersgill, who was sworn before the defendant, become informed of the fact that the defendant took Martin over to the restaurant in Cortlandt street and entertained him in the manner stated?

In addition to that, the solicitor of the complainant states that he handed a copy of the bill, affidavits and order to Mr. Martin on the 21st of April, requested him to serve them, and gave him instructions how to do so, and that Martin came into his office at Perth Amboy the next day and made the affidavit which is filed. But he states further that, on the 21st, he received from Mr. Martin a telegram, dated New York, in these words: "Paper served on original personally." This telegram was ruled out by the master, but I think the fact that such a telegram was received has some bearing on the case. The use of the word "original" in the telegram is explained by the fact that previously, on the 13th of April, a copy of the bill and affidavits, as appears by the affidavit of Silas H. Dalrymple, had been served upon Bessie & Bennett, as the attorneys of the defendant, at their office in New York City. Further, Pickersgill swears that defendant said that Miss D., who afterwards became the second Mrs. Kempson, and who acted as defendant's clerk, was present at the visit of Martin. She was not called as a witness, and no reason assigned why she was not.

Next, with regard to the service of the *injunction:* We have the affidavit of Mr. Meshrow for the service of that. Mr. Meshrow is a resident of Perth Amboy and engaged in the business of a private expressman, carrying small packages from Perth Amboy to New York. He was well acquainted with the defendant, and had frequently carried documents from Perth Amboy to his office in New York. His affidavit states that he served, on the 1st of May, a copy of the writ of injunction on Mr. Bennett, of the firm of Bessie & Bennett, and afterwards, on the 31st of May, on the defendant at his office, No. 173 Broadway, New York. It is proved by complainant's solicitor that he handed the injunction, with a certified copy of it, to Mr. Meshrow, and gave him instructions how to serve it. Mr. Meshrow swears that he went to the office, or rather suite of

offices, of the defendant in the building No. 173 Broadway; that he entered the building from the Cortlandt street side entrance, ascended in the elevator, and entered the outer of the three offices; that he knocked at the door of the second office, and a young lady (presumably Miss D.) came to the door and opened it a trifle, when he stepped forward and secured the door by putting one foot in. She asked whom he wished to see, and he answered Mr. Kempson. She replied that he was not in, and stepped back from the door, and turned to go into the third room, which was supposed to be Mr. Kempson's private office. He then got in the door with both feet, and Mr. Kempson came out from his office; that he shook hands with Mr. Kempson, and then passed to him, with his hand, the copy of the injunction that was without seal; that Mr. Kempson took it, glanced over it, and, while he was reading it, the witness unfolded the original, which had the seal upon it, and showed it to him, and told him that the other was the copy, and then he (witness) put it in his pocket; that he walked out of the door, and as he did so Mr. Kempson threw the copy over the witness' head into the ante-room, the witness passed from the ante-room into the hall, and Kempson came out into the ante-room, picked up the paper and threw it into the hall on a box, slammed the hall door closed, and the witness then left.

Mr. Kempson denied all this; said no such interview took place; but it is to be observed that the female whom he admits he had in his office was not called as a witness, nor any reason given why she was not called.

I therefore conclude that the injunction was served.

But beside that, there is abundant evidence in the case that he had notice, from something more reliable than mere rumor, as stated in his evidence, of the existence of the injunction. This plainly appears from reading the evidence of his friend and counsel, Mr. Gaynor, a member of the New York City bar. That gentleman swears that shortly after the decree of divorce was obtained, and before the ceremony of marriage took place with Miss D., a conference was had between himself and the defendant's New Jersey counsel and the defendant, in which the effect of the proceedings in New Jersey taken by the wife

were discussed, and also the question of whether he would be liable to attachment proceedings in contempt in New Jersey, by reason of the injunction issued there, if he went there to live with his proposed wife.   No explanation is made of this by the defendant, nor any suggestion made that he first heard of the injunction and became fearful of attachment proceedings after he obtained the decree of divorce.   The result of the consultation was that he resided in New York City with his second wife and a part of his children until the next May (1900), and then, before venturing to come to New Jersey, he sent Mr. Gaynor out to see the complainant and ask her to sign a paper, which he (Gaynor) had prepared for that purpose, in which she was asked to acknowledge the receipt of $10, and in consideration of that payment and of the same amount to be paid to her weekly thereafter, by her husband, she agreed and obligated herself never to interfere with or annoy him in anywise, or assert any claim to support, or any rights as a wife against him, or to acquiesce in or instigate any proceedings against him for alleged contempt of the court in the State of New Jersey; and further, to fully recognize as binding, valid and obligatory the decree of divorce obtained by Kempson, and that the weekly payment should be in full and complete satisfaction of all demands of every kind and description which she might have against her husband.   That paper she refused to sign, but Mr. Gaynor says that she did agree verbally that if $10 a week were paid to her she would not trouble her husband, but she distinctly stated she would not have him near her or have anything to do with him.   And on the strength of that verbal promise the defendant moved with his new wife to Metuchen, and has lived there with his second wife's parents ever since.

We now come to the *third* ground relied upon by the counsel for the defendant, and the one upon which he mainly relied, namely, that the defendant had a dispensation from his wife which justified his breach of the injunction.

As we have seen, the wife, shortly after the commencement of her suit, assumed the ownership and obtained control of the newspaper and printing establishment at Perth Amboy.   Among the exhibits is an issue of the "Middlesex County Democrat" of

the date of April 29th, 1899, which has as its head: " 'The Middlesex ,County Democrat.' Helen A. Kempson, manager;" and in it is an article in these words:

"To the Public: The general public is hereby informed that I am giving my personal attention to all my business affairs and that no one is authorized to act for me as attorney in fact or as agent.

"HELEN A. KEMPSON."

The inference from that is that, while she held the title to the stock of the corporation, she had previously given her husband some sort of a power of attorney to act for her. What legal proceedings she took in order to obtain possession does not appear, except as stated by counsel.

On the 12th of June, the return day of the injunction, the defendant sought and obtained an interview with the complainant, the object of which was to regain control of his business at Perth Amboy, in Middlesex county; also to avoid the effect of the injunction. But the immediate object, as stated to her, and as she understood it, was to get possession of the business at Perth Amboy; and with that view, and with no other that was expressed, he procured from her this note, in her own manuscript:

"METUCHEN, N. J.

"*Charles C. Hommann:*

"DEAR SIR—I hereby request and order you to cease all law suits against St. George Kempson, Sr.

"Yours truly,

"June 12, 1899.    HELEN A. KEMPSON."

That letter was taken to Mr. Hommann.

In reply to that letter, Mr. Hommann wrote her as follows:

"PERTH AMBOY, N. J., June 12th, 1899.

"DEAR MRS. KEMPSON—Your letter does not advise me what took place between you and Mr. K. at your interview yesterday. From what I learn from Mr. Dalrymple, however, I fear that you have made more trouble for yourself. If you gave him any authority to act for you in any manner you should revoke it at once unless you intend to undo all that has been done.

"Yours very truly,

"C. C. HOMMANN."

That letter was mailed at Perth Amboy on the 13th of June, and was probably written on that day and misdated the 12th, and was received by the complainant.

She thereupon revoked, by telegraph, the letter of June 12th, and defendant sought another interview with her. He denies receiving the telegram, but I believe he did receive it. The precise date of that second interview does not appear, but it was prior to the afternoon of June 16th, and at it, or about that time, the defendant obtained two other documents from the complainant, without date; but both have the date of June 13th in pencil on them, not in her handwriting, and not upon them when she signed them. In fact, it is not quite clear that they were both obtained at one time. It is not certain that the two in manuscript were not obtained before the one in typewriting, and before the telegram of revocation.

One of the two was in typewriting, and, of course, prepared before the interview, in these words:

"To whom it may concern, engaged in the business of the Kempson Publishing Co., or the publication of the Middlesex County Democrat, Metuchen Inquirer, Middlesex County Herald or any part of the printing business located at 103, 105, 107 Smith St., Perth Amboy, or Metuchen, N. J.: You are hereby notified that I have empowered St. George Kempson, Sr., to act entirely for me and to take full and complete charge of every part of the business above mentioned; that your engagement or employment from this moment is subject to his pleasure, and I will not further be responsible for your employment or otherwise, and you are further notified that this order takes effect immediately.

"HELEN A. KEMPSON,
"*President & Treasurer,*
"HELEN A. KEMPSON."

The other was in her own manuscript:

"I hereby authorize my business to be conducted by Mr. St. George Kempson, Sr., and would ask Mr. Hommann to stop any proceedings he may have against him.

"HELEN A. KEMPSON."

With those documents he, with his friend and counsel, Mr. Gaynor, had an interview with Mr. Pickersgill on Friday, June 16th, at the Kempson building, in Perth Amboy, where Pick-

ersgill was engaged in superintending the business of the office, as employe of the complainant, the result of which was that the next morning Mr. Pickersgill withdrew.

On the following Monday occurred the interview between defendant and Pickersgill, in which the defendant admitted the service of the order to show cause on him by Martin, as before stated.

The wife swears that all she had in mind in signing the three papers just mentioned was the reinstatement of her husband in the control of the newspaper.

In answer to the question of what conversation passed between her and her husband with regard to the writing of these letters, she answered:

"Well, he represented—I think he wanted to take charge of the business; wanted to go to Amboy to take charge of it.

"Q. Did you have any conversation with him at that time in relation to the divorce suit that he had brought or in relation to your suit against him to stop his divorce?

"A. No, never at that time.

"Q. To what did you understand this paper referred [referring to the letter]?

"A. To business at the office.

"Q. The newspaper business?

"A. The newspaper work."

To the same effect is the husband's evidence. He swears that before getting an amicable interview with her (producing the letter to Mr. Hommann of June 12th), he had one or two stormy interviews, in which she threatened to have him arrested. He rather carefully avoided saying that it was understood at the time that the papers in question had any reference to the equity suit she brought against him. Asked what he said to her in order to induce her to sign the paper in question, he said:

"Simply that I would go down there [Perth Amboy] and look after the conduct of the paper, dismiss those people that were robbing the business, put somebody in there and sell the business and give her a share of the proceeds."

And he says that when he presented the letter to Mr. Hommann he told him that it was pertaining to the children; the

necessity of his doing something with the business, as it was going to pieces. And again, he says he told her that if he did not go and rescue this business from those people down there it is going to pieces. "You must give me an order on your lawyer to stop all proceedings, or I will not go down there."

But be that as it may, I am satisfied, from the character and disposition of the husband, as manifested throughout the evidence in the cause, and also that of the wife, as manifested by her in the same way, that he was an imperious, overbearing and forceful man, and that she was of a nervous and unstable disposition, and quite unable to take care of herself when borne down upon by him.

On the evening of June 16th, after substantially succeeding in obtaining the evacuation of the newspaper office by Mr. Pickersgill, the defendant, with Mr. Gaynor, called on the wife, took tea with her, and spent some time there. At that visit the relations of the parties were discussed, and Mr. Gaynor strongly advised the parties to make up their differences and live together again; and the wife swears, and I believe her, that either her husband or Mr. Gaynor, speaking for him, promised that the proceedings for divorce should be abandoned, and that the defendant "would be as good in the future as he had been bad in the past," and that he would have nothing more to do with Miss D. And she swears that from that time on, for several weeks and months, she understood that Miss D. had abandoned the defendant and would have nothing more to do with him. Upon that promise she consented to make up with the defendant and live with him again.

I stop to say that it is quite plain that his relations with Miss D. had been for some time a cause of trouble and unpleasant relations between these spouses.

The defendant then resumed his former relations with his wife, made his home with her as much as he had previously done, and continued it up to the month of September of the same year, shortly before procuring the divorce. She swears that during that time he had marital intercourse with her, and also followed her to Asbury Park, where she spent some time in the hot weather, and had marital intercourse with her there.

The defendant admits the visits, but denies the marital intercourse. But I am entirely satisfied on both points—that he lived with her as husband and wife, as he had previously done, during the whole of that summer, and that he promised her that he would have nothing more to do with Miss D., and that the divorce proceedings were stopped. It is probably true that the complainant did not rely entirely upon his promise. She was poor; had a family of nine children, and was, of course, anxious about the daily food of herself and her children, and glad to get it upon any .terms.

The three documents already referred to are relied upon by the defendant, and also one other which was written by the complainant on July 26th, 1899, to a lawyer—Sunderhauf—at Wahpeton, North Dakota.

I have already mentioned a letter which she received from Mr. Sunderhauf, dated at Wahpeton, North Dakota, April 8th, 1899. She swears, and is corroborated therein by her solicitor, that she immediately upon its receipt handed it to him, and never saw it again until it was produced by him and shown to her when she was on the stand. She did not then recognize it, but there is no doubt, from the evidence of her solicitor, that it is the identical document, and that the envelope which brought it to Metuchen, where it arrived on the 12th of April, was endorsed in her husband's handwriting "personal."

That letter is intimately connected with the letter of July 26th, 1899, to Sunderhauf, relied upon by the defendant, and is of such a character that I deem it worth while to give it in full:

"WAHPETON, N. D., April 8th, 1899.

"*Mrs. St. George Kempson, Metuchen, N. J.,*

"DEAR MADAM—Your husband, Mr. St. George Kempson, who has been a resident of this state and town for some time, and who is NOT my' client, but with whom I have become acquainted, and with whom I have, from time to time talked over matters concerning his past domestic life, informed me to-day, in a general way, of the contents of a certain letter written by you to him, after a Mr. Bennett had served papers in a divorce suit on you.

"It appears that you have refused to make an appearance in the action, and that while you do not intend to contest Mr. Kempson's application for a decree here you intend to pay no further attention to the suit here.

pending, and allow your husband to obtain what is known as a default decree of divorce.

"It has always seemed to me that when people have come to the point where one of a married couple seeks a divorce, be it on real or fancied grounds, as long as matters have reached that certain stage where a future happy and contented living together is out of question, they ought at least submit to the inevitable in a sensible, business-like way.

"It has therefore occurred to me, in this particular case, that if the situation was placed before you, in a calm, dispassionate and frank way, you might reconsider your decision and thus I, owing to the ability of Mr. K.'s attorney to proceed at once, might be of some slight service to Mr. Kempson, of whom I have acquired a very favorable opinion, and who appears to me to be willing to treat with you and his family in the utmost good faith and liberality.

"I suggested to Mr. Kempson to-day the advisability of addressing you, and he then informed me that he had already asked Mr. Bennett to suggest to you my name, in case you desired representation in this state. I take it therefore that this letter will not strike you as unusual or unprofessional. I beg to assure you that it is prompted by a desire to at once assist my friend Mr. Kempson, as well as to secure to you those benefits which may be secured to you, under the plan which I am about to propose to you.

"As a basis for the consideration of the whole problem, I suppose it may be taken as an undisputable fact that you and Mr. Kempson will never live together again. Or if that proposition is too general, I may say that your life in the future can under no circumstances be a happy one. Mr. Kempson, at any rate, states to me that it will be utterly impossible for him to resume his former relation with you, no matter what may happen. On this basis, then, and in view of the fact that Mr. Kempson seems determined to obtain a decree of absolute divorce from you, it seems to me advisable that you should endeavor to place yourself in the very best possible position. Of course you may contest the suit. You may retain counsel here to fight the application of Mr. K. and force him to stay here indefinitely at a large expense, and perhaps, for all I know about the merits of the case, you may eventually beat him in our courts here. That will not bring him back to you nor will it assure to you any provisions for the future. It would be the means of breaking him up in business as well as in mind—and no good will ever come of it. Of this I am myself sincerely convinced—after having talked with Mr. K. many times about his future plans and intentions

"Secondly, you may let the matter go by default. That is to say, you may disregard the summons, which has been served upon you, and may thus allow Mr. K. to secure his decree at the end of the legal period without any defense from you. This is always a very questionable proceeding. In some of the eastern states such decrees are not held in high esteem by the courts. New Jersey is more liberal in that respect, and I have no doubt about the validity of such a decree in your state, but, in spite of that proposition I should regard a decree granted upon an appearance of more value. And the validity of this decree not only affects Mr. K., it also affects your *status*, and since you are still young, and the

Kempson *v.* Kempson.

future may have better fortune in store for you, as well as for him, it becomes at once of great interest to you to have the decree of divorce, if one is granted at all, legal in all respects and without anything or matter attaching to it, which might give rise to serious complications in the future, if not in New Jersey, perhaps in some other state of the union, wherever you or he may find yourselves years from now.

"If, then, you should authorize someone to appear for you here, with instructions to see that proper provisions for your future support are made, and that the matter of the custody and care of the children is considered and adjudged in a manner satisfactory to both of you, you would surely be the gainer by such a course. For, in the first instance, the decree would be good the world over, it would make provisions for your future and the future of your children, it would give you a chance to re-marry should you ever feel so inclined, and it would save Mr. K. considerable mental worry, to say nothing of expense. He would never be in a position to deny the validity of the decree or of its provisions for your support, as you can readily see, and since a permanent separation seems to be inevitable, and no reconciliation ever possible under any circumstances whatsoever, and since it is very likely that in case of your contesting the suit, or allowing it to go by default, Mr. K. may be placed in such financial straits as will make it impossible for him to provide for you in the future, I ask you in all candor if my plan of procedure does not commend itself to your good sense and judgment.

"If you, after giving this letter due and careful consideration, desire to adopt the plan herein outlined, and if you desire to avail yourself of my services in the matter, please address me in full confidence, giving me such details as to your wishes for the future as you deem proper, and I beg to assure you that your interests will be carefully guarded by me to the end that proper provision will be made for your support and the care and custody of the children. A copy of the decree will be sent to you in due time, and I believe you will never regret to have listened to disinterested counsel and advice.

"In conclusion I beg to say, that if you conclude to communicate with me on the subject, and, eventually, desire me to represent you, you may do so without any fear of expense—for Mr. K. will take it upon himself no doubt to see that you are not called upon to expend one single cent in bringing about a result most desired by him.

"Time to him means money, and money to him means money to you, and with your family money is what you need. Protracted litigation can only result in disaster.

"I trust you may receive this letter in the spirit in which it is written. I have no motive other than the one of being of some assistance to Mr. K. and yourself. I have already told Mr. K. that if I should be called upon to represent you I would do so without fee—merely for the purpose of facilitating the proceedings.

"And if, after reading these lines, you are in doubt about myself, but convinced about the force of my arguments here advanced, I suggest that there are hundreds of lawyers in the state whom you can employ to accomplish for you the things which I offer to accomplish for you in the best of faith, without expense to you.

"I shall be pleased to hear from you—whatever your decision may be—so as to settle definitely for Mr. K. the questions which are now consuming his mind with anxiety.

"Yours very respectfully,

"A. E. SUNDERHAUF."

On the 26th of July, at their residence in Metuchen, an angry discussion occurred between the complainant and the defendant, in the course of which, as he swears, he advised her to write to a lawyer in Wahpeton, North Dakota, to look out for her interests there. She testifies to the angry interview, and that his conduct was so overbearing and irritating that she lost her balance and became confused, and at his dictation, word for word, wrote a letter to Mr. Sunderhauf. The defendant produced what he swears is a copy of this letter, in his handwriting, the original to Sunderhauf not being produced. That copy, with erasures, is as follows:

"METUCHEN, N. J., July 26, 1899.

"*A. E. Sunderhauf, Esq.:*

"DEAR SIR—Referring to your letter of April ~~has~~ last in reference to my ~~su~~ Mr. St. George Kempsons suit for Divorce against me—I wish that you would defend the same if still is pending—for me and see to it that if a decree is granted that I have at least ~~to Ten Dollars a week alimon~~ that ~~my~~ Mr. Kempson is compelled to pay me at least [undecipherable erasure] Ten Dollars a week [undecipherable erasure] for the support of myself and children and that he be also compelled to ~~pr~~ provide a house for us to live in. You may take this letter as my authority to act in this matter in my behalf.

"Respectfully,"

The defendant swears that it was enclosed in an envelope, directed to Sunderhauf, and handed to him by complainant to be mailed, and that he mailed it.

A day or two afterwards complainant became distrustful of the propriety of her conduct, and wrote a letter to Mr. Sunderhauf, withdrawing the authority given him to enter an appearance for her. Mr. Sunderhauf did not answer her letter, and never did enter an appearance for her.

That the letter was dictated by her husband appears in the most satisfactory manner. He says he saw the original in Mr. Sunderhauf's possession in Wahpeton, and compared his copy with it there; but he swears that the copy produced by him was

made not from the original, but from a copy made by complainant and left in the house.

He tells at least two separate and distinct stories with regard to that copy—one, that she made it on the spot, and that he took it from the desk and made a copy of it; another, that he found her copy in the house some time afterwards (presumably, in order to make his story consistent, after she had gone to spend a short time at Asbury Park). Another was that he kept a copy of it at the time it was written. At one place he swears that he was not in the room when it was written, and at another place he swears he was standing at the door, so that he saw what was being done.

But the fact is that the paper itself, which, as I have said, is in his handwriting, shows upon its face evidence that it was not copied from another document. The erasures and use of inapt words prove that fact, and corroborate the wife's story that what she wrote was dictated by her husband word for word.

Further, if the copy produced was made from a copy made by complainant, why was not the copy so made produced? Why take the trouble to make another copy? In fine, I am satisfied that the copy produced was a draft prepared by defendant from which to dictate to his wife.

In addition to this, it must be remembered that the wife had not seen the Sunderhauf letter from the time it was received, on the 12th of April, until the date of her letter of the 26th of July, and it is not probable that she could recollect the proper address of the gentleman for so long a time.

Mr. Sunderhauf never answered this letter, nor acted upon it. The fair inference, therefore, is that he received the complainant's countermanding letter; and while the defendant does not swear that he saw this letter in Sunderhauf's hands before he procured his final decree, the fair inference is that it was prior to that time; and he must have learned at that time from Sunderhauf, or at least inferred from the fact that he did not enter the appearance, that he had received the countermanding letter.

Taking all the circumstances together, I do not see how the defendant can rely upon the letter to Sunderhauf—countermanded as it was, and no appearance entered by Sunderhauf

under it—as a permission by the complainant to the defendant to proceed and procure a divorce.   Of course, no one knew better than the defendant the great importance of having an appearance by the wife to his suit in Dakota entered by her written authority, and it is not probable that he omitted any reasonable effort to procure it; and it is difficult not to suspect, at least, that he was not truthful in denying that he knew nothing about Mr. Sunderhauf writing the letter of April 8th, and had made no arrangements with him for the writing thereof.

And here it is worth while to take notice of a clause in this letter of July 26th, 1899, which is strongly corroborative of the complainant's story to the effect that her husband had promised her to withdraw, and that he had withdrawn, the Dakota suit. The language is this:

"Referring to your letter of April last in reference to my Mr. St. George Kempson's suit for divorce against me, I wish that you would defend the same *if still is pending* for me."

If she understood at the time that she was authorizing Sunderhauf to deal with a live suit, why should such an expression as that be introduced?

Coming back to the documents of June 12th, 1899, and taking them altogether, I am unable to give to them the force asked for them by the counsel of the defendant.   They were written in the absence of her counsel, under the forceful influence of her husband, with the idea in her mind that they affected only her assertion of her right as the nominal holder of the stock in the printing association to take possession and control of the business, and without any proper advice as to their effect upon the injunction which she had obtained.   And further, I am satisfied that one, at least, was revoked by telegraph.

In coming to this conclusion I am applying but faintly the well-established rule that in transactions of this kind between husband and wife the overpowering influence of the husband is to be presumed.

But further, the right assured to her by her suit and the injunction granted thereon was of great value to her, and it seems to me that it could not be disposed of by such informal documents as those of June 12th, and that the defendant had no

right to rely upon them for that result. If he did so rely, he did it at the risk of her repudiation of the same. He should have moved to have the injunction dissolved and the bill dismissed, and allowed her to be heard in opposition thereto; and he had no right to treat the injunction as substantially dissolved by such means.

Moreover, in this connection, his conduct in promising to withdraw the Dakota suit, to refrain from intimacy with Miss D., and to act the part of a husband, and his performance of that promise for two or three months, thereby giving assurance to the complainant of his good faith, seems to me to have a bearing on the question. Anything that she did in the way of abandoning her suit was done upon his promise and partial performance of it; and when he abandoned her and proceeded to prosecute for his divorce he thereby must be held to have reinstated her in her former position.

The effect of what may be termed either an acquiescence in the breach of an injunction, or permission for such breach, has seldom been dealt with by the courts; and while I am not prepared to say that a mere verbal dispensation of a right acquired under an injunction may not, under certain circumstances, be sufficient to excuse the party enjoined and relieve from punishment for its violation, I think the authorities are clear that the acquiescence in the violation or permission to violate must be of a decided character in order to be efficient.

The question was raised in England, in the case of *Rodgers* v. *Nowill, 3 De G. M. & G. 614; S. C., 17 Jur. 109,* before Lord-Justices Knight-Bruce and Turner. There an injunction had been granted, which was violated by the defendants, and they set up that the violation had been acquiesced in by the complainants, and the excuse was held not sufficient. Lord-Justice Knight-Bruce said: "Now, if there had been great delay on the part of the plaintiffs, after being aware, as it is suggested, of the fact, *unless it amounted to a license,* I am not sure that it would make the defendants' case better." And Lord-Justice Turner used this language: "Then, on the question of acquiescence, I think that, in a case of this description, where there has been an injunction granted by this court, there must, in order to deprive the party who has obtained the injunction

Kempson *v.* Kempson.

of the right to move for committal upon the breach of it, be a case made out almost *amounting to such a license to the party enjoined to do the act enjoined against as would entitle him to maintain a bill against others for doing that act. The party enjoined must, I think, show such acquiescence as would be sufficient to create new right in him.* It is perfectly clear to my mind that in this case there has not been any such acquiescence as to entitle the defendants to set up any such right in themselves."

That language has been quoted with approval by other courts and by the text-writers. *2 High Inj. § 1450, note; 2 Joyce Inj. p. 1333 § 18 ¶ 17.*

It is quite clear that there was in this case no such license or permission as created a new right or would make a cause of action.

Upon a consideration of all the evidence on this part of the case I come to the conclusion that the defendant was not justified in proceeding to procure the divorce in violation of the terms of the injunction by anything that the complainant appears to have said or done, and he was clearly guilty of a contempt of this court in so doing.

But the defence set up in behalf of the defendant does not stop here. He makes the further point that the complainant has acquiesced in and ratified the decree of divorce which was granted. That decree provided that the defendant therein (the complainant herein) should have the custody and control of all nine of the children, naming them; and further, that the complainant should pay to the defendant $10 per week for support and maintenance of the children, provide a suitable home for her and said children to live in, until the further order of the court.

How that clause came to be inserted in the decree does not appear, nor does it appear that a copy of the decree was ever served on the complainant. But, on November 9th, 1899 (after his marriage with Miss D.), and on each week after that, the defendant paid the complainant $10, by check drawn by him as trustee to her order, and endorsed by her, and which had a marginal memorandum in these, or tantamount, words on each check: "In accordance with decree of divorce of North Dakota." This continued until the summer of 1900, when, after he came

to live at Metuchen with his second wife, he reduced the payment to $6 per week and omitted the marginal note.

Reliance is placed upon the endorsement of these checks during the period from November 8th, 1899, to May, 1900, during which time the defendant did not come within the state, and upon complainant's failure to prosecute for contempt after May, while the defendant was, at times, within the state up to November 26th, 1900, when these proceedings were commenced.

The same reasoning and authorities above cited as to the other defence apply here. The complainant must not be held to have ratified a decree of this character upon merely equivocal conduct or unimportant acts.

It is quite clear that she has done nothing to create an estoppel against herself in favor of her husband. He married Miss D. in October, 1899, before he made any payment to complainant, and so did not change his position in that respect upon the strength of any conduct of the complainant. Then the payments which he has made were certainly no greater in amount than a reasonable support of his wife and such of the children as she had with her. It was no more than this court would have compelled him to pay for that purpose on application by complainant for alimony. Plainly, a man situate as is the defendant, who can afford to take a second wife pending the life of the first who has committed no matrimonial offence, will not be permitted by a court of justice to say that he cannot pay his first wife enough for her comfortable support. In making the payments, therefore, defendant was doing no more than his simple duty, and he can claim no estoppel from it. Nor do I think that he can place the complainant in the position of ratifying his decree obtained in the face of the injunction of this court by writing the words he did on the checks. The wife's endorsement was probably made without advice or the thought of its effect. I think he ought not to be permitted to impose as a condition of the performance of a simple duty that his wife should ratify the decree. The utmost use he can be permitted to make of the marginal note in question is to use it as evidence that he has actually made the payments provided for in the decree, in case the wife should endeavor to enforce it against him.

I therefore come to the conclusion that the defendant is guilty of a contempt of this court. And the next and serious question is what punishment shall be meted out to him. He must, of course, pay a fine of not less than $5 to the state.

The complainant suggests a punishment which strikes me as being quite reasonable. It is that the defendant simply take proper measures to undo the result of the contemptuous act, and put the complainant in her former condition, and for this punishment there is authority.

In *Endicott* v. *Mathis, 1 Stock. 110,* the defendant had proceeded, notwithstanding an injunction of this court, to the trial of an action in ejectment, and, as I understand the case, obtained a verdict, and perhaps judgment, and then moved to dissolve the injunction. Chancellor Williamson (at *p. 113*) said: "Upon the case as presented by the affidavits I would (if there were no peculiar circumstances which induce me to think that justice to the defendant demands a different course) require him, before considering the motion for dissolution, to place the opposite party, as near as might be, in the same position at law as the injunction found him at the circuit."

And the late Chancellor McGill, in *Forrest* v. *Price, 7 Dick. Ch. Rep. 16,* after adjudging the defendant guilty of contempt for having received a large sum of money from the United States after an injunction had been issued against him and served forbidding the receipt says: "By infraction of the court's order of August 8th, 1892, the defendant had possessed himself of $31,704.08 in moneys. It is within his power to make amends for his disobedience to the extent of paying those moneys to the receiver appointed herein. It is also within his power to obey the order of December 21st, 1893, but I assume it is not within his power to restore the draft for $13,500 or the moneys which it called for." Then further on he says: "I will make this disposition of this matter: I will fine the defendant, Rodman M. Price, for his contempt, the sum of $50, to be paid to the clerk in chancery for the use of the state, and will order him to pay the $31,704.08 above mentioned within five days from the service upon him of a copy of the order or decree hereon, and order that, unless the fine be paid to the clerk, and the said moneys be paid to the receiver, and the directions of the order

of December 21st, 1893, be specifically complied with, and the costs of these proceedings in contempt be paid within five days from the service of such order, that the defendant shall be committed to the common jail of the county of Bergen, there to remain in close custody until he shall make said payments."

That decree was affirmed on appeal; and I think, in connection with what fell from Chancellor Williamson, in *Endicott* v. *Mathis,* is an authority for the action of the court asked for by the complainant. Moreover, the proposed punishment is a reasonable one, and quite in keeping with the remedial justice which the court always seeks to administer.

It may be suggested that this will place the second wife in an awkward position. I dealt with a somewhat similar question in the case of *Clayton* v. *Clayton, 14 Dick. Ch. Rep. 310.* There, on a bill of review, I advised that a decree of divorce be set aside, although the defendant had married after the decree and upon the strength of it. I held that any person who married a party who had recently been divorced, did it subject to the right of appeal and the liability to reversal on appeal, or to the failure of the decree to stand the test of a bill of review. It is common knowledge that decrees of divorce, obtained as was this, by persons who are actual residents of the east going for a few weeks or months to the west and setting up a residence there, are quite frail in their nature and liable to be disturbed when subjected to the test of judicial scrutiny here. It is impossible to suppose that the new wife did not know of the risk that she was running; and it is not necessary to determine whether any offspring that may be the result of the connection will be affected at all by an opening of the decree. The fact is, that she married a man at a time when, by a decree of a western court, he was, *prima facie,* free to marry. However that may be, the rights of the complainant cannot be affected by the marriage of the defendant, as it took place before she had done anything whatever that looked even like a confirmation of the decree.

I will advise a decree fining the defendant $5 and the costs of the proceedings, and that he be committed to the custody of the sheriff of the county of Middlesex until the fine and costs are paid, and until he shall take proper and efficient methods to open and set aside the decree which he has obtained in the Dakota court against the complainant.