## SHERRER *v.* SHERRER.

No. 36.   Argued October 13–14, 1947.—Decided June 7, 1948.

344

*Frederick M. Myers* argued the cause for petitioner. With him on the brief was *Francis J. Quirico*.

*Lincoln S. Cain* and *Robert T. Capeless* argued the cause for respondent. With him on the brief was *James M. Carroll*.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

We granted certiorari in this case and in *Coe* v. *Coe, post*, p. 378, to consider the contention of petitioners that Massachusetts has failed to accord full faith and credit to decrees of divorce rendered by courts of sister States.[1]

---

[1] U. S. Const. Art. IV, § 1, provides: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

The Act of May 26, 1790, 1 Stat. 122, as amended, R. S. § 905, 28 U. S. C. § 687, provides in part: ". . . And the said records and

Petitioner Margaret E. Sherrer and the respondent, Edward C. Sherrer, were married in New Jersey in 1930, and from 1932 until April 3, 1944, lived together in Monterey, Massachusetts. Following a long period of marital discord, petitioner, accompanied by the two children of the marriage, left Massachusetts on the latter date, ostensibly for the purpose of spending a vacation in the State of Florida. Shortly after her arrival in Florida, however, petitioner informed her husband that she did not intend to return to him. Petitioner obtained housing accommodations in Florida, placed her older child in school, and secured employment for herself.

On July 6, 1944, a bill of complaint for divorce was filed at petitioner's direction in the Circuit Court of the Sixth Judicial Circuit of the State of Florida.[2] The bill alleged extreme cruelty as grounds for divorce and also alleged that petitioner was a "bona fide legal resident of the State of Florida."[3] The respondent received notice by mail of the pendency of the divorce proceedings. He retained Florida counsel who entered a general appearance and filed an answer denying the allegations of petitioner's com-

judicial proceedings . . . shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the State from which they are taken."

[2] By statute, the Circuit Courts, as courts of equity, have jurisdiction of divorce causes. Florida Stat. Ann. § 65.01. *Meloche* v. *Meloche,* 101 Fla. 659, 662, 133 So. 339, 340 (1931).

[3] Section 65.02 of Florida Stat. Ann. provides: "In order to obtain a divorce the complainant must have resided ninety days in the State of Florida before the filing of the bill of complaint." The Florida courts have construed the statutory requirement of residence to be that of domicile. Respondent does not contend nor do we find any evidence that the requirements of "domicile" as defined by the Florida cases are other than those generally applied or differ from the tests employed by the Massachusetts courts. *Wade* v. *Wade,* 93 Fla. 1004, 113 So. 374 (1927); *Evans* v. *Evans,* 141 Fla. 860, 194 So. 215 (1940); *Fowler* v. *Fowler,* 156 Fla. 316, 22 So. 2d 817 (1945).

plaint, including the allegation as to petitioner's Florida residence.[4]

On November 14, 1944, hearings were held in the divorce proceedings. Respondent appeared personally to testify with respect to a stipulation entered into by the parties relating to the custody of the children.[5] Throughout the entire proceedings respondent was represented by counsel.[6] Petitioner introduced evidence to establish her Florida residence and testified generally to the allegations of her complaint. Counsel for respondent failed to cross-examine or to introduce evidence in rebuttal.

The Florida court on November 29, 1944, entered a decree of divorce after specifically finding that petitioner "is a bona fide resident of the State of Florida, and that this court has jurisdiction of the parties and the subject matter in said cause; . . ." Respondent failed to challenge the decree by appeal to the Florida Supreme Court.[7]

---

[4] The first allegation of respondent's answer stated: "That the Plaintiff is not a bona-fide legal resident of the State of Florida and has not been such continuously for more than the ninety days immediately preceding the filing of the bill of complaint. That on or about April 3, 1944, while the parties were living together as residents of Monterey, Massachusetts, the Plaintiff came to Florida with the children of the parties for a visit and without any expressed intention of establishing a separate residence from the Defendant and has remained in Florida ever since, but without any intention of becoming a bona-fide resident of Florida."

[5] The agreement provided that respondent should have custody of the children during the school term of each year and that petitioner should be given custody throughout the rest of the year, subject to the right of both parents to visit at reasonable times. Before the final decree of divorce was entered, respondent returned to Massachusetts accompanied by the two children.

[6] It is said that throughout most of the proceedings respondent did not appear in the courtroom but remained "in a side room."

[7] Appeals lie to the Florida Supreme Court from final decrees of divorce. Fla. Const. Art. V, § 5. And see e. g., Homan v. Homan, 144 Fla. 371, 198 So. 20 (1940).

On December 1, 1944, petitioner was married in Florida to one Henry A. Phelps, whom petitioner had known while both were residing in Massachusetts and who had come to Florida shortly after petitioner's arrival in that State. Phelps and petitioner lived together as husband and wife in Florida, where they were both employed, until February 5, 1945, when they returned to Massachusetts.

In June, 1945, respondent instituted an action in the Probate Court of Berkshire County, Massachusetts, which has given rise to the issues of this case. Respondent alleged that he is the lawful husband of petitioner, that the Florida decree of divorce is invalid, and that petitioner's subsequent marriage is void. Respondent prayed that he might be permitted to convey his real estate as if he were sole and that the court declare that he was living apart from his wife for justifiable cause.[8] Petitioner joined issue on respondent's allegations.

In the proceedings which followed, petitioner gave testimony in defense of the validity of the Florida divorce decree.[9] The Probate Court, however, resolved the issues of fact adversely to petitioner's contentions, found that

---

[8] The action was brought pursuant to the provisions of Mass. Gen. Laws (Ter. Ed.) c. 209, § 36.

[9] Petitioner testified that for many years prior to her departure for Florida, respondent had made frequent allusions to the fact that petitioner's mother had been committed to a mental institution and had suggested that petitioner was revealing the same traits of mental instability. Petitioner testified that as a result of these remarks and other acts of cruelty, her health had been undermined and that it had therefore become necessary for her to leave respondent. In order to insure her departure, she had represented that her stay in Florida was to be only temporary, but from the outset she had in fact intended not to return. Petitioner testified further that both before and after the Florida decree of divorce had been entered, she had intended to reside permanently in Florida and that she and Phelps had returned to Massachusetts only after receiving a letter stating that Phelps' father was in poor health.

she was never domiciled in Florida, and granted respondent the relief he had requested. The Supreme Judicial Court of Massachusetts affirmed the decree on the grounds that it was supported by the evidence and that the requirements of full faith and credit did not preclude the Massachusetts courts from reexamining the finding of domicile made by the Florida court.[10]

At the outset, it should be observed that the proceedings in the Florida court prior to the entry of the decree of divorce were in no way inconsistent with the requirements of procedural due process. We do not understand respondent to urge the contrary. The respondent personally appeared in the Florida proceedings. Through his attorney he filed pleadings denying the substantial allegations of petitioner's complaint. It is not suggested that his rights to introduce evidence and otherwise to conduct his defense were in any degree impaired; nor is it suggested that there was not available to him the right to seek review of the decree by appeal to the Florida Supreme Court. It is clear that respondent was afforded his day in court with respect to every issue involved in the litigation, including the jurisdictional issue of petitioner's domicile. Under such circumstances, there is nothing in the concept of due process which demands that a defendant be afforded a second opportunity to litigate the existence of jurisdictional facts. *Chicago Life Insurance Co.* v. *Cherry,* 244 U. S. 25 (1917); *Baldwin* v. *Iowa Traveling Men's Assn.,* 283 U. S. 522 (1931).

It should also be observed that there has been no suggestion that under the law of Florida, the decree of divorce in question is in any respect invalid or could successfully be subjected to the type of attack permitted by the Massachusetts court. The implicit assumption underlying the position taken by respondent and the Massachusetts court is that this case involves a decree of divorce valid

---

[10] 320 Mass. 351, 69 N. E. 2d 801 (1946).

and final in the State which rendered it; and we so assume.[11]

That the jurisdiction of the Florida court to enter a valid decree of divorce was dependent upon petitioner's domicile in that State is not disputed.[12] This requirement was recognized by the Florida court which rendered the divorce decree, and the principle has been given frequent application in decisions of the State Supreme Court.[13] But whether or not petitioner was domiciled in Florida at the time the divorce was granted was a matter to be resolved by judicial determination. Here, unlike the situation presented in *Williams* v. *North Carolina*, 325 U. S. 226 (1945), the finding of the requisite jurisdictional facts was made in proceedings in which the defendant appeared and participated. The question with which we are confronted, therefore, is whether such a finding made under the circumstances presented by this case may, consistent with the requirements of full faith and credit, be subjected to collateral attack in the courts of a sister State in a suit brought by the defendant in the original proceedings.

The question of what effect is to be given to an adjudication by a court that it possesses requisite jurisdiction in a case, where the judgment of that court is subsequently

---

[11] See *Williams* v. *North Carolina*, 325 U. S. 226, 233–234 (1945); *cf. Treinies* v. *Sunshine Mining Co.*, 308 U. S. 66, 78, note 26 (1939). No Florida case has been called to our attention involving a collateral attack on a divorce decree questioning the domicile of the parties, and hence the jurisdiction of the court which entered the decree, where both parties appeared in the divorce proceedings. See generally *Everette* v. *Petteway*, 131 Fla. 516, 528–529, 179 So. 666, 671–672 (1938); *State ex rel. Goodrich Co.* v. *Trammell*, 140 Fla. 500, 505, 192 So. 175, 177 (1939). But *cf. Chisholm* v. *Chisholm*, 98 Fla. 1196, 125 So. 694 (1929); *Dye* v. *Dolbeck*, 114 Fla. 866, 154 So. 847 (1934), involving attacks on jurisdictional findings made in *ex parte* divorce proceedings.

[12] *Bell* v. *Bell*, 181 U. S. 175 (1901).

[13] See note 3 *supra*.

subjected to collateral attack on jurisdictional grounds, has been given frequent consideration by this Court over a period of many years. Insofar as cases originating in the federal courts are concerned, the rule has evolved that the doctrine of *res judicata* applies to adjudications relating either to jurisdiction of the person or of the subject matter where such adjudications have been made in proceedings in which those questions were in issue and in which the parties were given full opportunity to litigate.[14] The reasons for this doctrine have frequently been stated. Thus in *Stoll* v. *Gottlieb,* 305 U. S. 165, 172 (1938), it was said: "Courts to determine the rights of parties are an integral part of our system of government. It is just as important that there should be a place to end as that there should be a place to begin litigation. After a party has his day in court, with opportunity to present his evidence and his view of the law, a collateral attack upon the decision as to jurisdiction there rendered merely retries the issue previously determined. There is no reason to expect that the second decision will be more satisfactory than the first."

This Court has also held that the doctrine of *res judicata* must be applied to questions of jurisdiction in cases arising in state courts involving the application of the full faith and credit clause where, under the law of the state in which the original judgment was rendered, such adjudications are not susceptible to collateral attack.[15]

---

[14] *Baldwin* v. *Iowa State Traveling Men's Association,* 283 U. S. 522 (1931); *Stoll* v. *Gottlieb,* 305 U. S. 165 (1938); *Chicot County Drainage District* v. *Baxter State Bank,* 308 U. S. 371 (1940); *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381 (1940); *Jackson* v. *Irving Trust Co.,* 311 U. S. 494 (1941). And see *Forsyth* v. *Hammond,* 166 U. S. 506 (1897); *Heiser* v. *Woodruff,* 327 U. S. 726 (1946).

[15] *American Surety Co.* v. *Baldwin,* 287 U. S. 156 (1932); *Treinies* v. *Sunshine Mining Co.,* 308 U. S. 66 (1939). And see *Chicago Life Insurance Co.* v. *Cherry,* 244 U. S. 25 (1917).

In *Davis* v. *Davis*, 305 U. S. 32 (1938), the courts of the District of Columbia had refused to give effect to a decree of absolute divorce rendered in Virginia, on the ground that the Virginia court had lacked jurisdiction despite the fact that the defendant had appeared in the Virginia proceedings and had fully litigated the issue of the plaintiff's domicile. This Court held that in failing to give recognition to the Virginia decree, the courts of the District had failed to accord the full faith and credit required by the Constitution. During the course of the opinion, this Court stated: "As to petitioner's domicil for divorce and his standing to invoke jurisdiction of the Virginia court, its finding that he was a bona fide resident of that State for the required time is binding upon respondent in the courts of the District. She may not say that he was not entitled to sue for divorce in the state court, for she appeared there and by plea put in issue his allegation as to domicil, introduced evidence to show it false, took exceptions to the commissioner's report, and sought to have the court sustain them and uphold her plea. Plainly, the determination of the decree upon that point is effective for all purposes in this litigation." [16]

We believe that the decision of this Court in the *Davis* case and those in related situations [17] are clearly indicative of the result to be reached here. Those cases stand for the proposition that the requirements of full faith and credit bar a defendant from collaterally attacking a divorce decree on jurisdictional grounds in the courts of a sister State where there has been participation by the defendant in the divorce proceedings, where the defendant has been accorded full opportunity to contest the jurisdictional issues, and where the decree is not susceptible

---

[16] *Davis* v. *Davis*, 305 U. S. 32, 40 (1938). And see *Stoll* v. *Gottlieb*, 305 U. S. 165, 172, note 13 (1938).

[17] See cases discussed *supra*.

to such collateral attack in the courts of the State which rendered the decree.[18]

Applying these principles to this case, we hold that the Massachusetts courts erred in permitting the Florida divorce decree to be subjected to attack on the ground that petitioner was not domiciled in Florida at the time the decree was entered. Respondent participated in the Florida proceedings by entering a general appearance, filing pleadings placing in issue the very matters he sought subsequently to contest in the Massachusetts courts, personally appearing before the Florida court and giving testimony in the case, and by retaining attorneys who represented him throughout the entire proceedings. It has not been contended that respondent was given less than a full opportunity to contest the issue of petitioner's domicile or any other issue relevant to the litigation. There is nothing to indicate that the Florida court would not have evaluated fairly and in good faith all relevant evidence submitted to it. Respondent does not even contend that on the basis of the evidence introduced in the Florida proceedings, that court reached an erroneous result on the issue of petitioner's domicile. If respondent failed to take advantage of the opportunities afforded him, the responsibility is his own. We do not believe that the dereliction of a defendant under such circumstances should be permitted to provide a basis for subsequent attack in the courts of a sister State on a decree valid in the State in which it was rendered.

It is suggested, however, that *Andrews* v. *Andrews,* 188 U. S. 14 (1903), militates against the result we have reached. In that case a husband, who had been domiciled in Massachusetts, instituted divorce proceedings in

---

[18] We, of course, intimate no opinion as to the scope of Congressional power to legislate under Article IV, § 1 of the Constitution. See note 1 *supra.*

a South Dakota court after having satisfied the residence requirements of that State. The wife appeared by counsel and filed pleadings challenging the husband's South Dakota domicile. Before the decree of divorce was granted, however, the wife, pursuant to a consent agreement between the parties, withdrew her appearance from the proceedings. Following the entry of the decree, the husband returned to Massachusetts and subsequently remarried. After his death a contest developed between his first and second wives as to the administration of the husband's estate. The Massachusetts court concluded that the South Dakota decree of divorce was void on the ground that the husband had not been domiciled in that State and that, under the applicable statutes of Massachusetts, the Massachusetts courts were not required to give recognition to such a decree. This Court affirmed on writ of error by a divided vote.[19]

On its facts, the *Andrews* case presents variations from the present situation.[20] But insofar as the rule of that case may be said to be inconsistent with the judgment herein announced, it must be regarded as having been superseded by subsequent decisions of this Court. The *Andrews* case was decided prior to the considerable modern development of the law with respect to finality of jurisdictional findings.[21] One of the decisions upon which the majority of the Court in that case placed primary reliance, *Wisconsin* v. *Pelican Insurance Co.*, 127 U. S. 265 (1888), was, insofar as pertinent, overruled in *Milwaukee County* v. *White Co.*, 296 U. S. 268 (1935). The *Andrews* case, therefore, may not be regarded as determinative of the issues before us.

---

[19] Justices Brewer, Shiras, and Peckham dissented. Mr. Justice Holmes took no part in the case.

[20] Thus, in the *Andrews* case, before the divorce decree was entered by the South Dakota court, the defendant withdrew her appearance in accordance with a consent agreement.

[21] See note 14 *supra*.

It is urged further, however, that because we are dealing with litigation involving the dissolution of the marital relation, a different result is demanded from that which might properly be reached if this case were concerned with other types of litigation. It is pointed out that under the Constitution the regulation and control of marital and family relationships are reserved to the States. It is urged, and properly so, that the regulation of the incidents of the marital relation involves the exercise by the States of powers of the most vital importance. Finally, it is contended that a recognition of the importance to the States of such powers demands that the requirements of full faith and credit be viewed in such a light as to permit an attack upon a divorce decree granted by a court of a sister State under the circumstances of this case even where the attack is initiated in a suit brought by the defendant in the original proceedings.[22]

But the recognition of the importance of a State's power to determine the incidents of basic social relationships into which its domiciliaries enter does not resolve the issues of this case. This is not a situation in which a State has merely sought to exert such power over a domiciliary. This is, rather, a case involving inconsistent assertions of power by courts of two States of the Federal Union and thus presents considerations which go beyond the interests of local policy, however vital. In resolving the issues here presented, we do not conceive it to be a part of our function to weigh the relative merits of the policies of Florida and Massachusetts with respect to divorce and related matters. Nor do we understand the decisions of this Court to support the proposition that the obligation imposed by Article IV, § 1 of the Constitution and the Act of Congress passed thereunder amounts to something less than the duty to accord *full* faith and credit to decrees of

[22] But *cf. Williams* v. *North Carolina,* 325 U. S. 226, 230 (1945).

divorce entered by courts of sister States.[23]   The full faith and credit clause is one of the provisions incorporated into the Constitution by its framers for the purpose of transforming an aggregation of independent, sovereign States into a nation.[24]   If in its application local policy must at times be required to give way, such "is part of the price of our federal system."   *Williams* v. *North Carolina,* 317 U. S. 287, 302 (1942).[25]

This is not to say that in no case may an area be recognized in which reasonable accommodations of interest may properly be made.   But as this Court has heretofore made clear, that area is of limited extent.[26]   We believe that in permitting an attack on the Florida divorce decree which again put in issue petitioner's Florida domicile and in refusing to recognize the validity of that decree, the Massachusetts courts have asserted a power which cannot be reconciled with the requirements of due faith and credit.   We believe that assurances that such a power will be exercised sparingly and wisely render it no less repugnant to the constitutional commands.

It is one thing to recognize as permissible the judicial reexamination of findings of jurisdictional fact where such

---

[23] *Davis* v. *Davis,* 305 U. S. 32, 40 (1938); *Williams* v. *North Carolina,* 317 U. S. 287, 294 (1942).

[24] *Milwaukee County* v. *White Co.,* 296 U. S. 268, 276–277 (1935); *Magnolia Petroleum Co.* v. *Hunt,* 320 U. S. 430, 439 (1943).

[25] But we may well doubt that the judgment which we herein announce will amount to substantial interference with state policy with respect to divorce.  Many States which have had occasion to consider the matter have already recognized the impropriety of permitting a collateral attack on an out-of-state divorce decree where the defendant appeared and participated in the divorce proceedings. See, *e. g., Norris* v. *Norris,* 200 Minn. 246, 273 N. W. 708 (1937); *Miller* v. *Miller,* 65 N. Y. S. 2d 696 (1946), affirmed 271 App. Div. 974, 67 N. Y. S. 2d 379 (1947); *Cole* v. *Cole,* 96 N. J. Eq. 206, 124 A. 359 (1924).

[26] *Broderick* v. *Rosner,* 294 U. S. 629, 642 (1935); *Williams* v. *North Carolina,* 317 U. S. 287, 294–295 (1942).

findings have been made by a court of a sister State which has entered a divorce decree in *ex parte* proceedings.[27] It is quite another thing to hold that the vital rights and interests involved in divorce litigation may be held in suspense pending the scrutiny by courts of sister States of findings of jurisdictional fact made by a competent court in proceedings conducted in a manner consistent with the highest requirements of due process and in which the defendant has participated. We do not conceive it to be in accord with the purposes of the full faith and credit requirement to hold that a judgment rendered under the circumstances of this case may be required to run the gantlet of such collateral attack in the courts of sister States before its validity outside of the State which rendered it is established or rejected. That vital interests are involved in divorce litigation indicates to us that it is a matter of greater rather than lesser importance that there should be a place to end such litigation.[28] And where a decree of divorce is rendered by a competent court under the circumstances of this case, the obligation of full faith and credit requires that such litigation should end in the courts of the State in which the judgment was rendered.

*Reversed.*

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE MURPHY concurs, dissenting.*

What Mr. Justice Holmes said of the ill-starred *Haddock* v. *Haddock* may equally be said here: "I do not suppose that civilization will come to an end whichever way this case is decided." 201 U. S. 562, 628. But, believing as I do that the decision just announced is calculated, however unwittingly, to promote perjury without

---

[27] *Williams* v. *North Carolina,* 325 U. S. 226 (1945).

[28] Cf. *Stoll* v. *Gottlieb,* 305 U. S. 165, 172 (1938).

*[This is also a dissent to *Coe* v. *Coe, post,* p. 378.]

otherwise appreciably affecting the existing disharmonies among the forty-eight States in relation to divorce, I deem it appropriate to state my views.

Not only is today's decision fraught with the likelihood of untoward consequences. It disregards a law that for a century has expressed the social policy of Massachusetts, and latterly of other States, in a domain which under our Constitution is peculiarly the concern of the States and not of the Nation.

If all that were necessary in order to decide the validity in one State of a divorce granted in another was to read the Full Faith and Credit Clause of the Constitution, generations of judges would not have found the problem so troublesome as they have, nor would a divided Court have successively pronounced a series of discordant decisions. "Full faith and credit" must be given to a judgment of a sister State. But a "judgment" implies the power of the State to deal with the subject-matter in controversy. A State court which has entered what professes to be a judgment must have had something on which to act. That something is what is conveyed by the word "jurisdiction," and, when it comes to dissolving a marriage status, throughout the English-speaking world the basis of power to act is domicile. Whether or not in a particular situation a person is domiciled in a given State depends on circumstances, and circumstances have myriad diversities. But there is a consensus of opinion among English-speaking courts the world over that domicile requires some sense of permanence of connection between the individual who claims it and the State which he asks to recognize it.

It would certainly have been easier if from the beginning the Full Faith and Credit Clause had been construed to mean that the assumption of jurisdiction by the courts of a State would be conclusive, so that every other State would have to respect it. But such cer-

tainly has not been the law since 1873. *Thompson* v. *Whitman*, 18 Wall. 457. Nor was it the law when this Court last considered the divorce problem, in 1945. *Williams* v. *North Carolina*, 325 U. S. 226. A State that is asked to enforce the action of another State may appropriately ascertain whether that other State had power to do what it purported to do. And if the enforcing State has an interest under our Constitution in regard to the subject-matter that is vital and intimate, it should not be within the power of private parties to foreclose that interest by their private arrangement. *Andrews* v. *Andrews*, 188 U. S. 14; cf. *Fall* v. *Eastin*, 215 U. S. 1; *Alaska Packers Association* v. *Industrial Accident Commission*, 294 U. S. 532.

If the marriage contract were no different from a contract to sell an automobile, the parties thereto might well be permitted to bargain away all interests involved, in or out of court. But the State has an interest in the family relations of its citizens vastly different from the interest it has in an ordinary commercial transaction. That interest cannot be bartered or bargained away by the immediate parties to the controversy by a default or an arranged contest in a proceeding for divorce in a State to which the parties are strangers. Therefore, the constitutional power of a State to determine the marriage status of two of its citizens should not be deemed foreclosed by a proceeding between the parties in another State, even though in other types of controversy considerations making it desirable to put an end to litigation might foreclose the parties themselves from reopening the dispute.[1] I cannot agree that the Constitution forbids

---

[1] Nor do I regard *Davis* v. *Davis*, 305 U. S. 32, as contrary authority. That case did not depend for its result on the fact that there had been an adjudication of the jurisdiction of the court rendering the divorce enforced, inasmuch as this Court found that the State granting the divorce was in fact that of the domicile. 305 U. S. at 41. Moreover this Court's citation therein of *Andrews* v. *Andrews*,

a State from insisting that it is not bound by any such proceedings in a distant State wanting in the power that domicile alone gives, and that its courts need not honor such an intrinsically sham proceeding, no matter who brings the issue to their attention.

That society has a vital interest in the domestic relations of its members will be almost impatiently conceded.[2] But it is not enough to pay lip-service to the commonplace as an abstraction. Its implications must be respected. They define our problems. Nowhere in the United States, not even in the States which grant divorces most freely, may a husband and wife rescind their marriage at will as they might a commercial contract. Even if one thought that such a view of the institution of marriage was socially desirable, it could scarcely be held that such a personal view was incorporated into the Constitution or into the law for the enforcement of the Full Faith and Credit Clause, enacted by the First Congress. 1 Stat. 122, 28 U. S. C. § 687. That when the Constitution was ordained divorce was a matter of the deepest public concern, rather than deemed a personal dispute between private parties, is shown by the fact that it could be secured almost exclusively only by special enactments of the several legislatures and not through litigation in court. See Ireland and Galindez, Divorce in the Americas (1947) p. 1.

---

*supra,* indicates an absence of intention to overrule the holding of that case that opportunity to litigate the issue of domicile does not foreclose inquiry as to the true facts. *Andrews* v. *Andrews* has since been cited with respect, as recently as *Williams* v. *North Carolina,* 317 U. S. 287, 309, 320, n. 7, and 325 U. S. 226, 229, 240, 242.

[2] Compare the English laws providing for a King's Proctor to represent the interests of the Crown in divorce proceedings. Sections 5–7, Matrimonial Causes Act, 1860, 23 & 24 VICT., c. 144; § 1, Matrimonial Causes Act, 1873, 36 & 37 VICT., c. 31; § 181, The Supreme Court of Judicature (Consolidation) Act, 1925, 15 & 16 GEO. 5, c. 49, 9 Halsbury's Statutes of England 393–94.

As a contract, the marriage contract is unique in the law. To assimilate it to an ordinary private contract can only mislead. See *Maynard* v. *Hill,* 125 U. S. 190, 210–14; Restatement of the Law, Contracts, §§ 584, 586; cf. *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 627–29. The parties to a marriage do not comprehend between them all the interests that the relation contains. Society sanctions the institution and creates and enforces its benefits and duties. As a matter of law, society is represented by the permanent home State of the parties, in other words, that of their domicile. In these cases that State was Massachusetts.

Massachusetts has seen fit to subject its citizens to the following law:

> "A divorce decreed in another jurisdiction according to the laws thereof by a court having jurisdiction of the cause and of both the parties shall be valid and effectual in this commonwealth; but if an inhabitant of this commonwealth goes into another jurisdiction to obtain a divorce for a cause occurring here while the parties resided here, or for a cause which would not authorize a divorce by the laws of this commonwealth, a divorce so obtained shall be of no force or effect in this commonwealth." Mass. Gen. Laws c. 208, § 39 (1932).

This statute, in substance,[3] was first enacted in 1835,

---

[3] Rev. L. 1835, c. 76:

§ 39. "When any inhabitant of this state shall go into any other state or country, in order to obtain a divorce for any cause, which had occurred here, and whilst the parties resided here, or for any cause, which would not authorize a divorce, by the laws of this state, a divorce so obtained shall be of no force or effect in this state."

§ 40. "In all other cases, a divorce decreed in any other state or country, according to the law of the place, by a court having jurisdiction of the cause and of both of the parties, shall be valid and effectual in this state."

and even then merely formalized a prior rule of judicial origin. Cf. *Hanover* v. *Turner,* 14 Mass. 227; Report of the Commissioners Appointed to Revise the General Statutes of the Commonwealth, pt. II, p. 123; 2 Kent, Commentaries, Lect. 27, *108–*109. The Uniform Annulment of Marriages and Divorce Act,[4] passed by Delaware,[5] New Jersey,[6] and Wisconsin,[7] is almost identical, as is a Maine statute [8] on the same subject.

Massachusetts says through this statute that a person who enjoys its other institutions but is irked by its laws concerning the severance of the marriage tie, must either move his home to some other State with more congenial laws, or remain and abide by the laws of Massachusetts. He cannot play ducks and drakes with the State, by leaving it just long enough to take advantage of a proceeding elsewhere, devised in the interests of a quick divorce, intending all the time to retain Massachusetts as his home, and then return there, resume taking advantage of such of its institutions as he finds congenial but assert his freedom from the restraints of its policies concerning severance of the marriage tie. Massachusetts has a right to define the terms on which it will grant divorces, and to refuse to recognize divorces granted by other States to parties who at the time are still Massachusetts domiciliaries. Has it not also the right to frustrate evasion of its policies by those of its permanent residents who leave the State to change their spouses rather than to change their homes, merely because they go through a lukewarm or feigned contest over jurisdiction?

The nub of the *Williams* decision was that the State of domicile has an independent interest in the marital

[4] See note 13, *infra.*

[5] Del. Rev. Code, c. 86, § 29 (1935).

[6] N. J. Stat. Ann. § 2:50:35 (1939).

[7] Wis. Stat. § 247.21 (1945).

[8] Me. Rev. Stat., c. 73, § 12 (1930).

status of its citizens that neither they nor any other State with which they may have a transitory connection may abrogate against its will. Its interest is not less because both parties to the marital relationship instead of one sought to evade its laws. In the *Williams* case, it was not the interest of Mrs. Williams, or that of Mr. Hendryx, that North Carolina asserted. It was the interest of the people of North Carolina. The same is true here of the interest of Massachusetts.[9] While the State's interest may be expressed in criminal prosecutions, with itself formally a party as in the *Williams* case, the State also expresses its sovereign power when it speaks through its courts in a civil litigation between private parties. Cf. *Shelley* v. *Kraemer,* 334 U. S. 1.

Surely there is involved here an exercise by Massachusetts of its policy concerning the termination of marriage by its own citizens. The Framers left that power over domestic relations in the several States, and every effort to withdraw it from the States within the past sixty years has failed.[10] An American citizen may change his domicile from one State to another. And so, a State must respect another State's valid divorce decree even though it concerns its former citizens. But the real question here is whether the Full Faith and Credit Clause can be used as a limitation on the power of a State over its citizens who do not change their domicile, who do not remove to another State, but who leave the State only long enough to escape the rigors of its laws, obtain a divorce, and then

---

[9] The result of the assertion of the State's interest may be a windfall to a party who has sought to bargain his or her rights away and now seeks to renege on the agreement. This fact, however, should scarcely be allowed to stand in the way of the assertion by the State of its paramount concern in the matter. Such an unexpected windfall to a party, who by ethical standards may be regarded as undeserving, is a frequent consequence of findings of lack of jurisdiction. See Holmes, C. J., in *Andrews* v. *Andrews,* 176 Mass. 92, 96.

[10] See note 13, *infra.*

scurry back. To hold that this Massachusetts statute contravenes the Full Faith and Credit Clause is to say that that State has so slight a concern in the continuance or termination of the marital relationships of its domiciliaries that its interest may be foreclosed by an arranged litigation between the parties in which it was not represented.[11]

Today's decision may stir hope of contributing toward greater certainty of status of those divorced. But when people choose to avail themselves of laws laxer than those of the State in which they permanently abide, and where, barring only the interlude necessary to get a divorce, they choose to continue to abide, doubts and conflicts are inevitable, so long as the divorce laws of the forty-eight States remain diverse, and so long as we respect the law that a judgment without jurisdictional foundation is not constitutionally entitled to recognition everywhere. These are difficulties, as this Court has often reminded, inherent in our federal system, in which governmental power over domestic relations is not given to the central government. Uniformity regarding divorce is not within the power of this Court to achieve so long as "the domestic relations of husband and wife . . . were matters reserved to the States." *Ohio ex rel. Popovici* v. *Agler,* 280 U. S. 379,

---

[11] Today's decision would also seem to render invalid, under the Full Faith and Credit Clause, a large proportion of the commonly encountered injunctions against a domiciliary prosecuting an out-of-State divorce action. Cf. *Kempson* v. *Kempson,* 58 N. J. Eq. 94, 61 N. J. Eq. 303, 63 N. J. Eq. 783; Pound, *The Progress of the Law—Equity,* 33 Harv. L. Rev. 420, 425–28; Jacobs, *The Utility of Injunctions and Declaratory Judgments in Migratory Divorce,* 2 Law & Contemp. Prob. 370; Note, 13 Bklyn. L. Rev. 148. Since no State may enjoin its inhabitants from changing their domiciles in order to procure divorces, it would seem that henceforth a recital of domicile in the out-of-State divorce decree will render the injunction retroactively invalid if there has been any semblance of a contest in the divorce proceeding.

384; *In re Burrus,* 136 U. S. 586, 593–94.[12] And so long as the Congress has not exercised its powers under the Full Faith and Credit Clause to meet the special problems raised by divorce decrees, this Court cannot through its adjudications achieve the result sought to be accomplished by a long train of abortive efforts at legislative and constitutional reform.[13] To attempt to shape policy so as to avoid disharmonies in our divorce laws

---

[12] The Massachusetts law is surely legislation within the field regulating the domestic relations of husband and wife, and, as such, within the scope of "matters reserved to the States." It can scarcely be doubted that if a constitutional amendment withdrew this field from the States and gave it to the Federal Government, an Act of Congress, making the same provision substantively as did Massachusetts, regarding divorces granted in countries other than the United States to citizens of this country, would be held constitutional. Such a law is not less a law concerning "the domestic relations of husband and wife," even though incidentally it may affect the force to be given to what appears to be a judgment of a sister State.

[13] Three modes of achieving uniformity have been attempted— adoption of a constitutional amendment authorizing Federal domestic relations legislation; Congressional action implementing the Full Faith and Credit Clause; and uniform State legislation. Such attempts were originally fostered by those who sought legislation rendering divorce uniformly *difficult* to obtain. See Lichtenberger, Divorce (1931) pp. 187 *et seq.;* Cavers, Foreword, 2 Law & Contemp. Prob. 289.

The first effort to amend the Constitution to empower Congress to enact domestic relations legislation uniform throughout the Nation was made in 1884. Since then at least seventy similar amendments have been proposed. Ames, The Proposed Amendments to the Constitution of the United States during the First Century of its History, [1896] Ann. Rep. American Historical Ass'n, reprinted as H. R. Doc. No. 353, 54th Cong., 2d Sess., pt. 2, p. 190; Sen. Doc. No. 93, 69th Cong., 1st Sess.; "Proposed Amendments to the Constitution of the United States Introduced in Congress from the 69th Congress, 2d Session through the 78th Congress, December 6, 1926, to December 19, 1944" (U. S. Govt. Printing Office, 1946). None has been favorably acted upon. See, *e. g.,* H. R. Rep. No. 1290, 52nd Cong., 1st Sess., p. 2, in which the majority of the House Judiciary Committee, reporting adversely on such a proposed amendment, pointed out that

was not a power entrusted to us, nor is the judiciary competent to exercise it. Courts are not equipped to pursue the paths for discovering wise policy. A court is

---

Congress might achieve a measure of uniformity through exercise of its existing powers to implement the Full Faith and Credit Clause.

Suggestions that such a statute be enacted by Congress have not been lacking. See, *e. g.*, 52 Rep. A. B. A. 292, 319; Corwin, *The "Full Faith and Credit" Clause*, 81 U. of Pa. L. Rev. 371, 388; cf. Mr. Justice Stone, dissenting, in *Yarborough* v. *Yarborough*, 290 U. S. 202, 215, n. 2; Jackson, *Full Faith and Credit—The Lawyer's Clause of the Constitution*, 45 Col. L. Rev. 1, 21. And Senator McCarran of Nevada is currently seeking to have such legislation adopted. See S. 1960, 80th Cong., 2d Sess.

The most vigorous efforts, however, have been made in the direction of securing uniform State legislation. President Theodore Roosevelt, in calling on Congress to provide for compilation of marriage and divorce statistics, included a suggestion of cooperation among the States in enacting uniform laws. 15 Richardson, Messages and Papers of the Presidents 6942. On the initiative of the Governor of Pennsylvania, a National Congress on Uniform Divorce Laws, in which forty-two States were represented, was called in 1906. This Congress resolved that a constitutional amendment was not feasible and drafted resolutions concerning uniform State legislation. Lichtenberger, *supra*, 191–96. See also Proceedings, National Congress on Uniform Divorce Laws (1906) *passim*; Proceedings 2d Meeting of the Governors of the States of the Union (1910) pp. 185–98. It is interesting to note that even these proponents of uniformity advocated that each State "adopt a statute embodying the principle contained in" the very Massachusetts statute now held unconstitutional by the Court perhaps in the interests of uniformity. Lichtenberger, *supra*, at 194.

The bill prepared by the Congress was also approved by the Commissioners on Uniform State Laws (Proceedings, 17th Ann. Conf., Commissioners on Uniform State Laws (1907) pp. 120 *et seq.*) but was adopted by only three States. See pp. 360–361, *supra*. The Commissioners eventually decided that no uniform law establishing substantive grounds for divorce could succeed, and replaced this proposal with the Uniform Divorce Jurisdiction Act, which would have accorded recognition to a wider range of decrees than were protected by *Haddock* v. *Haddock*, 201 U. S. 562, then in force. [1930] Handbook of the National Conference of Commissioners on Uniform State

confined within the bounds of a particular record, and it cannot even shape the record. Only fragments of a social problem are seen through the narrow windows of a litigation. Had we innate or acquired understanding of a social problem in its entirety, we would not have at our disposal adequate means for constructive solution. The answer to so tangled a problem as that of our conflicting divorce laws is not to be achieved by the simple judicial resources of either/or—this decree is good and must be respected, that one is bad and may be disregarded. We cannot draw on the available power for social invention afforded by the Constitution for dealing adequately with the problem, because the power belongs to the Congress and not to the Court. The only way in which this Court can achieve uniformity, in the absence of Congressional action or constitutional amendment, is by permitting the States with the laxest divorce laws to impose their policies upon all other States. We cannot as judges be ignorant of that which is common knowledge to all men. We cannot close our eyes to the fact that certain States make an industry of their easy divorce laws, and encourage inhabitants of other States to obtain "quickie" divorces which their home States deny them.[14] To permit such States

---

Laws, pp. 498–502. This act has been adopted only by Vermont, L. 1931, No. 45, and was repealed two years later. L. 1933, No. 38.

Meanwhile, other organizations have not given up the attempt to have enacted uniform divorce laws, although in recent years the objective has usually been uniformly liberal rather than uniformly repressive legislation. See, e. g., Woman's Home Companion, Dec., 1947, p. 32.

Even in the international field, attempts to avoid conflicts as to the extraterritorial validity of divorces have been made. See, e. g., Convention to Regulate Conflicts of Laws and of Jurisdiction in Matters of Divorce and Separation, The Hague, June 12, 1902.

[14] See the interesting account of Nevada's divorce mill, written by two members of the Nevada Bar, Ingram and Ballard, *The Business of Migratory Divorce in Nevada,* 2 Law & Contemp. Prob. 302; cf. Bergeson, *The Divorce Mill Advertises, id.* at 348.

to bind all others to their decrees would endow with constitutional sanctity a Gresham's Law of domestic relations.

Fortunately, today's decision does not go that far. But its practical result will be to offer new inducements for conduct by parties and counsel, which, in any other type of litigation, would be regarded as perjury, but which is not so regarded where divorce is involved because ladies and gentlemen indulge in it. But if the doctrine of *res judicata* as to jurisdictional facts in controversies involving exclusively private interests as infused into the Full Faith and Credit Clause is applied to divorce decrees so as to foreclose subsequent inquiry into jurisdiction, there is neither logic nor reason nor practical desirability in not taking the entire doctrine over. *Res judicata* forecloses relitigation if there has been an opportunity to litigate once, whether or not it has been availed of, or carried as far as possible. *Cromwell* v. *County of Sac,* 94 U. S. 351; *Chicot County Drainage District* v. *Baxter State Bank,* 308 U. S. 371.[15] And it applies to questions of jurisdiction of subject matter as well as to that of persons. *Stoll* v. *Gottlieb,* 305 U. S. 165; *Treinies* v. *Sunshine Mining Co.,* 308 U. S. 66. Why should it not apply where there has been a wasted opportunity to litigate, but should apply where the form of a contest has been gone through?[16] Or if more than form is required, how much of a contest must it be? Must the contest be bellicose or

---

[15] *Quaere,* whether today's decision applies to *ex parte* Nevada decrees by default, where the defendant later files a general appearance and the record is made to show jurisdiction *nunc pro tunc.* Nev. Comp. Laws (1931–1941 Supp.) § 9488.

[16] It is by no means clear that the issue before the Massachusetts courts in either of these cases was or could have been litigated in Florida or Nevada. All that the Florida or Nevada courts could have determined was whether the jurisdictional requisites of State law and of the due process clause of the Constitution were met. And if a direct attack on these decrees had been made in this Court, all

may it be pacific? Must it be fierce or may it be tepid? Must there be a cloud of witnesses to negative the testimony of the plaintiff, or may a single doubter be enough? Certainly if the considerations that establish *res judicata* as between private litigants in the ordinary situations apply to the validity of a divorce against the public policy of the State of domicile, it cannot make a rational difference that the question of domicile is contested with bad feeling rather than amicably adjusted. The essence of the matter is that through the device of a consent decree a policy of vital concern to States should not be allowed to be defied with the sanction of this Court. If perchance the Court leaves open the right of a State to prove fraud in the ordinary sense—namely, that a mock contest was won by prearrangement—the claim falls that today's decision will substantially restrict the area of uncertainty as to the validity of divorces. If the Court seeks to avoid this result by holding that a party to a feigned legal contest cannot question in his home State the good faith behind an adjudication of domicile in another State, such

---

that we could have decided would have been the due process point. A divorce may satisfy due process requirements, and be valid where rendered, and still lack the jurisdictional requisites for full faith and credit to be mandatory. Compare *Williams* v. *North Carolina,* 317 U. S. 287, 307 (concurring opinion), with *Williams* v. *North Carolina,* 325 U. S. 226. This is true even though the Florida and Nevada courts appear to characterize the jurisdictional prerequisites under their respective laws as domicile, *Wade* v. *Wade,* 93 Fla. 1004, 1007; *Latterner* v. *Latterner,* 51 Nev. 285; since we may be unwilling to apply as loose a test of "domicile," in determining whether extrastate enforcement is mandatory, as those States might properly choose to use in determining what divorces might be granted and effective within their own borders. Thus, at no point in the proceedings in Florida or Nevada in the instant cases was there an opportunity to litigate whether Mrs. Sherrer or Mr. Coe had acquired Florida or Nevada domicile, respectively, sufficient to entitle their divorces to extraterritorial recognition.

holding is bound to encourage fraud and collusion still further.

In considering whether the importance of the asserted uncertainties of marital status under existing law is sufficient to justify this result, it is important to think quantitatively, not dramatically. One would suppose that the diversity in the divorce laws of the forty-eight States, and the unwillingness of most of them to allow the few which make an industry out of granting divorce to impose their policies upon the others, undermines the structure of the family and renders insecure all marriages of previously divorced persons in the United States. The proportion of divorced people who have cause to worry is small indeed. Those who were divorced at home have no problem. Those whose desire to be rid of a spouse coincided with an unrelated shift of domicile will hardly be suspect where, as is usually true, the State to which they moved did not afford easy divorces or required a long residence period. Actually, there are but five States, Arkansas, Florida, Idaho, Nevada, and Wyoming, in which divorces may be easily obtained on less than one year's residence.[17] Indovina and Dalton, *Statutes of All States and Territories with Annotations on Marriage-Annulment-Divorce* (Santa Monica, 1945). These five States accounted for only 24,370 divorces in 1940, but 9% of the national total. Dept. of Commerce, *Statistical Abstract of the United States* (1946) p. 94. The number of divorces granted in Arkansas, Idaho, and Wyoming is small enough to indicate the normal incidence of divorce among their permanent population, with only few transients taking advantage of their divorce laws. Nevada and Florida thus attract virtually all the non-resident

---

[17] North Carolina appears to be the only other State allowing divorce on less than a year's residence, but it does not allow divorce for many of the usual causes. The *Williams* cases attest that its laws are not lax.

divorce business. Yet, between them, only 16,375 divorces were granted in 1940, 6% of the total. *Ibid.* Some of these people were undoubtedly permanently settled in those States, and have nothing to fear. Others may have moved to those States, intending to make their permanent homes there, and have since remained. They were amply protected by the Full Faith and Credit Clause even before today's decision. The only persons at all insecure are that small minority who temporarily left their home States for a State—one of the few—offering quick and easy divorce, obtained one, and departed. Is their security so important to the Nation that we must safeguard it even at the price of depriving the great majority of States which do not offer bargain-counter divorces of the right to determine the laws of domestic relations applicable to their citizens?

Even to a believer in the desirability of easier divorce—an issue that is not our concern—this decision should bring little solace. It offers a way out only to that small portion of those unhappily married who are sufficiently wealthy to be able to afford a trip to Nevada or Florida, and a six-week or three-month stay there.[18]

Of course, Massachusetts may not determine the question of domicile in disregard of what her sister States have found. A trial *de novo* of this issue would not satisfy the requirements which we laid down in the second *Williams* case, 325 U. S. at 236. Nor can Massachusetts make find-

---

[18] The easier it is made for those who through affluence are able to exercise disproportionately large influence on legislation, to obtain migratory divorces, the less likely it is that the divorce laws of their home States will be liberalized, insofar as that is deemed desirable, so as to affect all. See Groves, *Migratory Divorces,* 2 Law & Contemp. Prob. 293, 298. For comparable instances, in the past, of discrimination against the poor in the actual application of divorce laws, cf. Dickens, Hard Times, c. 11; Hankins, *Divorce,* 5 Encyc. Soc. Sci. 177, 179.

ings on this issue which preclude reexamination by this Court, nor may it, through prejudice in favor of its own policies, strain the facts to find continuance of the tie between the parties and itself. But the records in these cases do not justify the conclusion that Massachusetts has been remiss in its duty of respect. It is true that its courts did not employ a formal legal jargon and say that there was a presumption in favor of the findings of Florida or Nevada and that this presumption had been overcome by the evidence. But the Constitution demands compliance, not a form of words. To ascertain whether in fact there is a real basis for saying that Massachusetts did not accord proper recognition to Nevada's and Florida's findings, we must turn to the records and discover for ourselves just how much warrant there was for their findings of domicile.

The petitioner and respondent in *Sherrer* v. *Sherrer* were married in New Jersey in 1930, and moved to Monterey, Massachusetts, in 1932, where they lived together until 1944. They had two children. There was evidence that their relationship became less than harmonious towards the end of this period, that Mrs. Sherrer was troubled by a sinus infection and had been advised by a physician to go to Florida, and that she consulted a Massachusetts attorney about divorce before leaving. In March, 1944, she told Sherrer that she wished to take a trip to Florida for a month's rest and wanted to take the children along. She later testified that she had intended even then to go to Florida to stay, but had lied in order to obtain her husband's consent. His consent and the necessary funds were forthcoming. On April 3, 1944, Mrs. Sherrer and the children left for Florida, taking along a suitcase and a small bag, but leaving behind a trunk, some housedresses, and much of the children's clothing. They arrived the following day. She rented an apartment in St. Petersburg, which they occupied for about

three weeks, then moved into a furnished cottage and later into another furnished cottage.

About a week after Mrs. Sherrer's departure, one Phelps, who had previously been at least an acquaintance of hers, knowing that she had gone to St. Petersburg, went there, met her soon after, and saw her frequently. On April 20, she wrote to her husband that she did not care to go back to him, and returned the money for train fare which he had sent. She sent her older daughter to school and took a job as a waitress. Phelps found employment in a lumber yard.

Florida law permits institution of proceedings for divorce after ninety days' bona fide residence in the State. On July 6, ninety-three days after her arrival in the State, Mrs. Sherrer consulted a Florida attorney, had the necessary papers drawn up, and filed a libel for divorce the same day. Sherrer, receiving notice by mail, retained Florida counsel, who entered a general appearance and filed an answer, which denied Mrs. Sherrer's allegations as to residence. The case was set for hearing on November 14. On November 9, Sherrer arrived on the scene. He and his wife entered into a stipulation, subject to the approval of the court, providing for custody of the children in him during the school year and in her during summer vacations. At the hearing, Sherrer's attorney was present, and Sherrer remained in a side room. The attorney did not cross-examine Mrs. Sherrer or offer evidence as to either jurisdiction or the merits, other than the stipulation regarding custody of the children. Sherrer was called into the courtroom and questioned as to his ability to look after the children during the school year. The hearing was closed, the decree being held up pending filing of a deposition by Mrs. Sherrer. On November 19, Sherrer returned to Massachusetts with the children. On November 29, the deposition was filed and the decree entered. On December 1, the petitioner mar-

ried Phelps and the couple took up residence in the cottage which she and the children had previously occupied.

There they remained until early in February, 1945, when they returned to Massachusetts, staying for a few days at Westfield and then returning to Monterey. Phelps' father lived in Westfield, and Phelps testified that his father's critical illness occasioned their return. A few days later, Phelps was served with papers in a $15,000 alienation of affections action brought by Sherrer. He testified that the pendency of this action was the reason for his remaining in Massachusetts even after his father's health had become less critical. The trial was set many months ahead, but Phelps and the petitioner did not return to Florida. Rent on the Florida cottage for a month following their departure was paid, but this may have been required, as it was paid on a monthly basis. Some personal belongings were left behind there. Later, the landlord was informed that Phelps and the petitioner would not continue renting the cottage, and still later they asked that their belongings be sent to Monterey.

Sherrer had meanwhile moved out of the house which he and the petitioner had formerly lived in, which they owned together. Phelps and the petitioner moved in, and did not return to Florida. On June 28, 1945, a petition was filed by Sherrer in the Berkshire County Probate Court for a decree setting forth that his wife had deserted him and that he was living apart from her for justifiable cause. A statute provided that such a decree would empower a husband to convey realty free of dower rights. Mass. Gen. Laws c. 209, § 36 (1932). The Probate Court found that Mrs. Sherrer had not gone to Florida to make it her permanent home but with the intention of meeting Phelps, divorcing Sherrer, marrying Phelps, and returning to Massachusetts. These findings were upheld by the Supreme Judicial Court of the State.

The parties in *Coe* v. *Coe* were married in 1934 in New York City. Until 1939, they spent a large part of each year in travel, but had only one home, owned by Coe, in Worcester, Massachusetts. Coe also owned other land, maintained bank accounts, paid taxes, registered his automobile, etc., all in Worcester.

Beginning in 1940, Coe also maintained an apartment in New York City, where much of his business was conducted. He usually lived there during the week, returning to Worcester on week ends. In New York City there also lived one Dawn Allen, his secretary and friend. His relations with Mrs. Coe deteriorated. It appears that during this period as well, his principal domicile was in Worcester. His own testimony as to where he intended to make his home at this time was contradictory. He kept bank accounts and most of his funds in New York and did jury duty there. He used his Worcester address in correspondence and when incorporating a personal corporation.[19] The trial judge found that his domicile remained in Worcester.

In January, 1942, Mrs. Coe filed a petition for separate support in the Worcester County Probate Court. Coe cross-petitioned for divorce. On March 25, Coe's petition was dismissed, and Mrs. Coe's granted; she was awarded $35 per week. She appealed, complaining of the amount. While the appeal was pending, Coe left Worcester for New York, and accompanied by Dawn Allen and her mother, left New York on May 31, for Reno, Nevada, arriving there on June 10. He lived at the Del Monte Ranch. He testified that he went there to relieve his asthma and because of Nevada's liberal tax laws. He also gave conflicting testimony as to whether

---

[19] For purposes of State taxation, he might well have been regarded as domiciled in either State. Cf. *Worcester County Trust Co.* v. *Riley*, 302 U. S. 292; *Texas* v. *Florida*, 306 U. S. 398.

he went there in order to get a divorce. On June 11, he consulted a lawyer for whom his Worcester attorney had prepared a divorce memorandum. He opened a bank account and rented a safe-deposit box, registered his automobile and took out a driver's license, all in Nevada. He did not sever his other ties with New York or Massachusetts.

Nevada law permits institution of proceedings for divorce after six weeks' residence. Forty-seven days after his arrival in the State, Coe filed a complaint for divorce, alleging six weeks' bona fide residence. Notice was mailed to Mrs. Coe, who followed to Reno, engaged an attorney, and demurred to the complaint. Subsequently, however, she and Coe entered into a written agreement, providing for a lump sum payment to Mrs. Coe of $7,500, and $35 per week. On September 19, she filed an answer in which she admitted Coe's residence as alleged in his complaint, and a cross-complaint. On the same day, a divorce was granted to Mrs. Coe, and the court adopted the agreement. Also on the same day, Coe married Dawn Allen. Two days later they left Reno, returned to New York, where Coe gave up his apartment, and returned to Worcester on October 1, residing at a house owned by him there.

On February 25, 1943, the Supreme Judicial Court of Massachusetts affirmed the separate maintenance decree of the Worcester County Probate Court. Coe made no payments to the respondent under either that decree or that of the Nevada court, other than the $7,500 lump sum. On May 22, 1943, respondent filed a petition in the Probate Court to have him cited for contempt. Coe petitioned to have the decree revoked because of the supervening Nevada divorce decree.

While this was pending, Coe and Dawn spent a part of the summer of 1943 at the Del Monte Ranch, near

Reno, to confer with Coe's Nevada divorce lawyer and to negotiate for the purchase of the Ranch. Apparently, the purchase was not made. With the exception of this period, he and Dawn have resided at Worcester continuously since their marriage. Coe kept his bank accounts and post-office box there, and paid his poll tax and other local taxes. In February, 1944, he purchased a more expensive house, into which they moved. In various formal papers, he noted Worcester as his residence.

On October 21, 1943, the Probate Court, on the basis of the Nevada divorce, revoked its separate maintenance decree. The respondent's proffer of evidence to show lack of jurisdiction in the Nevada court was rejected. This ruling was reversed by the Supreme Judicial Court, which sent the case back to allow evidence contradicting the Nevada finding of domicile. On remand, such evidence was taken, the gist of which has been summarized. The Probate Court found that the parties had been domiciled in Massachusetts throughout, and that Coe's trip to Nevada was made in order to obtain a divorce and not to change his domicile. These findings were upheld by the Supreme Judicial Court.

Conceding that matters of credibility were for the triers of fact, the evidence appears to me to have been ample to justify the findings that were made, even giving every weight to the contrary Nevada and Florida determinations and treating the burden on the party contradicting those determinations as most heavy. Judges, as well as jurors, naturally enough may differ as to the meaning of testimony and the weight to be given evidence. I would not deem it profitable to dissent on such an issue touching the unique circumstances of a particular case. My disagreement with the decision of the Court is not as to the weight of the evidence, but concerns what I take to be its holding, that the opportunity of the parties to litigate

the question of jurisdiction in Nevada and Florida foreclosed Massachusetts from raising the question later. If the Court had merely held that the evidence was not sufficient to justify Massachusetts' findings, contrary to what was recited in the decrees of Nevada and Florida, or, as an added assurance that obligations of recognition be honored, had required of the Massachusetts court explicit avowal of the presumption in favor of the Florida and Nevada decrees, I should have remained silent. But the crux of today's decision is that regardless of how overwhelming the evidence may have been that the asserted domicile in the State offering bargain-counter divorces was a sham, the home State of the parties is not permitted to question the matter if the form of a controversy has been gone through. To such a proposition I cannot assent. Decisions of this Court that have not stood the test of time have been due not to want of foresight by the prescient Framers of the Constitution, but to misconceptions regarding its requirements. I cannot bring myself to believe that the Full Faith and Credit Clause gave to the few States which offer bargain-counter divorces constitutional power to control the social policy governing domestic relations of the many States which do not.