[Civ. No. 14042. First Dist., Div. Two. Sept. 19, 1949.]

Estate of LEO SCHOMAKER, Deceased. GARNETT CHRISTINE SCHOMAKER, Appellant, v. MARGARET EDY, Respondent.

Walter H. Duane for Appellant.

William A. O'Brien for Respondent.

RUNNELLS, J. pro tem.—This is an appeal from an order appointing respondent, Margaret Edy, the administratrix of the estate of Leo Schomaker, deceased.

On September 18, 1947, Garnett Schomaker, appellant herein, filed in the Superior Court of the City and County of San Francisco her petition for letters of administration of the estate of Leo Schomaker, deceased; it was alleged in the petition that Leo Schomaker died intestate at Lovelock, Nevada, on September 13, 1947; that at the time of his death he was a resident of and left estate in the city and county of San Francisco; that petitioner was his surviving widow and that the other heirs of deceased were a son and two brothers.

On September 30, 1947, Margaret Edy filed in said court her petition for letters of administration in which she alleged the death of Leo Schomaker; that at the time of his death he was a resident of the State of Nevada; that he left estate in the city and county of San Francisco; that he died intestate; that on September 30, 1947, petitioner was appointed the guardian of Donald L. Schomaker, a minor, son of said decedent; and that the heirs or next of kin of decedent were said minor son, two brothers and Mrs. Garnett Schomaker, divorced wife of decedent.

The hearing of the two petitions was held on October 14, 1947, at which time said Margaret Edy filed a contest to the petition of Garnett Schomaker for letters of administration and objections to the granting of her said petition; in said contest Margaret Edy alleged that she was the mother and natural guardian of Donald L. Schomaker, the only child of decedent Leo Schomaker; that on September 18, 1947, the said court appointed contestant the special administratrix of the estate of said decedent and that she thereafter qualified as such special administratrix; that on September 30, 1947, said court appointed contestant the guardian of the person and estate of Donald L. Schomaker, said minor, and that she thereafter qualified as such guardian; that said contestant and petitioner denied all of the allegations contained in the petition for letters of administration of said Garnett Schomaker, save and except that contestant admitted that the minor, Donald L. Schomaker, was the heir of said decedent and that said decedent died in Nevada on the 13th day of September, 1947; contestant specifically denied that decedent was a resident of San Francisco on the date of his death and specifically denied that Garnett Schomaker was the surviving widow of said decedent. As further grounds of contest the contestant averred that the marriage of said decedent to said Garnett Schomaker was terminated by a valid decree of divorce duly given and entered by the district court of the Fifth Judicial District of the State of Nevada in and for the county of Elko on the 12th day of September, 1947; that on September 8, 1947, appellant and respondent entered into a property settlement agreement wherein in consideration of the sum of $2,500 appellant waived all her community interest in the community property of the marriage and relinquished all her rights as heir of decedent and the right to act as administratrix of his estate; that on said last mentioned date appellant

in consideration of the sum of $2,500 executed a waiver relinquishing all claims to community property, alimony and support and agreed to be estopped forever from asserting the right to act as administratrix of the estate of decedent.

A certified copy of the judgment and decree of the Nevada court, property settlement agreement and waiver and release were admitted in evidence.

Counsel for appellant argues: (1) there was no evidence introduced at the trial to support the finding that the Nevada court had jurisdiction of the person and subject matter of the divorce but to the contrary, so he contends, it was clearly established that the deceased did not live in Nevada more than 15 days at the time he received the divorce, and cites among other authorities, *Andrews* v. *Andrews,* 188 U.S. 14 [23 S.Ct. 237, 47 L.Ed. 366]; *Williams* v. *North Carolina,* 325 U.S. 226 [65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366], and *Estate of Bruneman,* 32 Cal.App.2d 606 [90 P.2d 323], and (2) that the property settlement agreement was based on fraud. (Citing cases.) On the other hand, respondent asserts that *Heuer* v. *Heuer,* 33 Cal.2d 268 [201 P.2d 385], is decisive of the issue involved here.

The principal issue here presented is: Do the requirements of full faith and credit bar the appellant from collaterally attacking the Nevada divorce decree? If this issue is answered in the affirmative no other issues are involved.

The deceased and appellant were married at Wild Horse, Nevada, on August 14, 1945; deceased operated a tavern known as "The Blue Lamp" on Geary Street in San Francisco, which business was sold in June, 1947, and thereupon deceased notified appellant that he intended going to Nevada and entering into business there; appellant testified that deceased went to Nevada in July, 1947, remained there four days and returned to San Francisco and lived with her until August 25, 1947, when he again went to Nevada. In other words, appellant's contention is that deceased was actually in Nevada less than 20 days when the decree of divorce was made and entered. Several witnesses testified they had seen deceased in California on various occasions during August, 1947.

A. E. Graziani, an attorney residing in San Francisco was employed on September 3, 1947, by deceased and his attorney to contact appellant; the contact was made on the afternoon of that day at which time, according to the testimony of Mr. Graziani, he informed appellant that he was an attorney at law in the city and county of San Francisco; that he was

engaged by Mr. Schomaker and his attorney to prepare a property settlement agreement and power of attorney which were to be presented to her for her signature. Continuing Mr. Graziani testified: ''I had certain documents which I had been told that she was willing to sign—in fact, she was agreeable—had agreed—to sign them, and they were ready for her signature. She wanted to know how much she was being offered, and I told her $2200 in cash. She wanted to know why it was not $2500, and I informed her that she had already received $300. She told me that she felt that $2500 would be sufficient, but she didn't want to credit the $300 that she had already received, but wanted $2500 in full, if I could possibly get her $2500. I told her I would do what I could, and I eventually succeeded in getting her $2500 in cash . . . She told me that they had had a good deal of marital trouble, that Mr. Schomaker had sold his tavern, that she knew he had gotten mostly cash for it, that he had gone to Nevada, and she couldn't very well pursue him up there, and if she didn't take this $2500 she felt that she would receive nothing from him; that he had been a bartender before he sold this tavern, and that he probably would wind up by being a bartender again when he had spent all of his money and gambled it away.'' Again concerning another interview with appellant on September 8, 1947, Mr. Graziani testified: ''I had prepared this property settlement agreement and a power of attorney, and a release—complete release of all rights—and I showed Mrs. Schomaker the papers, I read them to her, I explained them to her, and she expressed a willingness to sign them. She still reiterated that she wanted $2500 in cash—she didn't want to credit the $300 to the total to be paid. However, she was willing to settle for the $300 that she had plus $2200 more, if I couldn't get the extra $300 for her. I told her that I would do my best to get her the extra $300—I told her that I felt that the $300 would not be a stumbling block—that Mr. Schomaker would be willing to give her the extra $300. She then wanted to sign the papers, and I asked her if she understood them fully, and she said she did. She told me at that time that Mr. Schomaker had been a bartender most of his life, he had been fortunate enough to get this bar, had sold it for a high price, had gotten the cash, was in Nevada, and if she didn't take the $2500 she probably would not get a thing from him. She expressed no desire at that time to go to Nevada to fight the divorce. I told her if she wanted to go, she could go, but she did not desire to go—

she was willing to take the $2500. I told her it would be best to sign before a Notary, . . ."

On September 11, 1947, Mr. Graziani called Mrs. Schomaker and told her that she could have the $2,500 any time she wanted it and stated to her that Mr. Schomaker was to pay his fee and that he was sending the papers on to Nevada by air mail. Then continuing the witness testified: "I gave her a copy and I read them to her while she followed the copy with her eyes. As we went along, she asked me various questions which I endeavored to explain to her about the property settlement agreement. I believe she fully understood the agreements and all of the papers which she signed." Thereupon the following testimony was given by Mr. Graziani: "Q. Any other questions that you can recall in the course of this interview? A. She asked about the power of attorney, which was in blank—there was no name for the attorney—and the waiver—it is a form that is used very commonly by attorneys in Nevada—that is usually filed—prepared and executed in blank, and filed—and I told her that it would be necessary for her to submit herself to the jurisdiction of the Court, going there directly herself, or by appointing an attorney in Nevada who would accept the summons in her place and stead, and who would also waive notice of time and place of trial, findings of fact and conclusions of law. She said she didn't understand those things, but I explained them to her to the best of my ability. Q. You did explain them? A. Yes. Q. Did she at that time express any concern as to whether or not she would get a valid divorce? A. She wanted to be sure that she got a valid divorce.

"Mr. Duane: I will ask that that go out——

"Mr. O'Brien: Q. What did she say in that regard? A. She said to me, 'If I sign these papers and they enter a divorce, will the divorce be good?' And I said yes. Q. In the discussion of the sale of the decedent's business—namely, the Blue Lamp—did she discuss with you how much money he had obtained for that? A. Yes. Q. Tell us that whole discussion? A. She knew as much about it as I did——

"Mr. Duane: I will ask that that go out. A.—She told me that he received $25,000 for the Blue Lamp, $15,000 in cash, a promissory note with chattel mortgage for $10,000, and she told me also that he received an additional $10,000 under the counter—'under the counter' was the expression she used—making a total of $35,000 for the sale of the Blue Lamp.

"MR. O'BRIEN: Q. When did she tell you that? A. She told me that at the conversation that we had on September 8th in my office. Q. So you did, then, in fact, fully explain all of the various documents which you have referred to and which you asked her to execute at that time? A. Yes. Q. And she did, as far as you were able to observe, fully understand them? A. Yes. Q. And the only objection that she indicated was that she wanted the additional $300? A. Yes, she wanted the additional $300. Q. Which you subsequently secured for her? A. Yes."

After appellant was told by Mr. Graziani that he had the $2,500 for her she instructed him to forward the papers to Nevada and advised him to hold the money for a few days and she would let him know what she wanted done with it. The money remains in the possession of Mr. Graziani.

Appellant notified Mr. Graziani that she knew Mr. William McDonnell, assistant public defender. Upon receiving this information Mr. Graziani said to appellant: "You understand that I am representing Mr. Schomaker; wouldn't you like to go to Mr. McDonnell and have him represent you on this thing so that he can explain these papers to you?" And again, "Now, if you would like to go over to Mr. McDonnell's office with all these papers, you can get independent advice from him—he has represented you before, and you know him, and she said, 'No, I don't need a lawyer—you can explain the papers to me.'"

Her counsel, thus obtained and who derived his authority through the medium of a power of attorney which she executed with full knowledge of its import, filed an answer and represented her in open court throughout the proceedings. The testimony adduced at the trial in Elko, Nevada, disclosed that the deceased's residence in Elko County had been continuous and uninterrupted for a period of six weeks immediately prior to the date of the trial.

In its findings of fact, the probate court found that all of the allegations of the petition for letters of administration of Margaret Edy were true, and in order to make this finding, credence must have been given to Graziani's testimony. It would appear, too, that appellant knew the purport of the instruments which she signed and had complete knowledge that an attorney in Elko would represent her in the divorce proceedings.

It is believed a solution to the problem may be found, as

respondent contends, in an application of the law as held in *Heuer* v. *Heuer*, 33 Cal.2d 268 [201 P.2d 385]. The distinguishing features between the Heuer case and the instant case are that in the former after the divorce action was commenced in Nevada by the husband, the wife, a resident of California, went to Nevada, and after being served there with summons and complaint, engaged an attorney who filed an answer and cross-complaint for separate maintenance and thus tendered the issue of jurisdictional requirements.

In the Heuer case, *supra,* it is said (p. 270) : ''The findings of jurisdictional defects were based on alleged sham and fraudulent intent in the domiciliary claims of the husband. The plaintiff now concedes that two recent decisions of the Supreme Court of the United States, *Sherrer* v. *Sherrer*, 334 U.S. 343 [68 S.Ct. 1087, 92 L.Ed. 1429, 1 A.L.R.2d 1355], and *Coe* v. *Coe*, 334 U.S. 378 [68 S.Ct. 1094, 92 L.Ed. 1451, 1 A.L.R.2d 1376], decided June 7, 1948, are controlling adversely to her contentions regarding the validity of the Nevada decree. Facts in those cases were somewhat similar to those involved here.

''In *Sherrer* v. *Sherrer* the wife went from Massachusetts to Florida and sued for divorce. The husband appeared in the action personally and by counsel. The wife was granted a divorce. She received custody of the minor children pursuant to the parties' stipulation read into the record. The husband returned to Massachusetts and sought a judicial declaration that the divorce and subsequent remarriage of the wife were invalid. A decree in his favor was affirmed by the Supreme Judicial Court of Massachusetts.

''In *Coe* v. *Coe* the wife obtained an award of support in a Massachusetts court. The husband journeyed to Nevada and there instituted divorce proceedings. The wife went to Nevada to contest the husband's action and to obtain a divorce for herself. She filed an answer denying other allegations but admitting the allegation as to the husband's residence. Both parties were present personally and by counsel at the trial. The wife was granted a divorce. She returned to Massachusetts and brought contempt proceedings against the husband for failure to comply with the prior support order. A contempt order based on a holding of the invalidity of the Nevada decree was affirmed on appeal.

''The Supreme Court reversed in each case. The reversals resolved the main issue in the present case on a declaration that 'the requirements of full faith and credit bar a defendant

from collaterally attacking a divorce decree on jurisdictional grounds in the courts of a sister State where there has been participation by the defendant in the divorce proceedings, where the defendant has been accorded full opportunity to contest the jurisdictional issues, and where the decree is not susceptible to such collateral attack in the courts of the State which rendered the decree.' (*Sherrer* v. *Sherrer, supra,* at p. 351, 68 S.Ct. at p. 1091.) The test therefore is not whether the issue of jurisdiction was actively litigated in the court rendering the divorce decree. It is sufficient if the defendant has participated in the proceedings and had full opportunity to litigate the issue. If so, the decree is binding even though a relitigation of the question of jurisdictional residence requirements in another state might result in a finding that the domiciliary claim was fraudulently asserted for the purpose of obtaining a decree which as a matter of policy could not be procured in the state of actual domicile. Therefore where, as here, the finding of the requisite jurisdictional facts was made in divorce proceedings in another state in which the defendant appeared and participated, and the decree has become final, it must be given full faith and credit in the courts of this state.

"The trial court's conclusion that the Nevada decree is invalid is therefore erroneous."

The order is affirmed.

Goodell, Acting P. J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 17, 1949.