[Civ. No. 19562.   Second Dist., Div. Two.   Oct. 19, 1953.]

MARTHA OUTLAW HUNTINGTON, Respondent, v. HENRY EDWARDS HUNTINGTON II, Appellant.

706

Newell & Chester and Robert M. Newell for Appellant.

Hightower & Martin and John L. Martin for Respondent.

MOORE, P. J.—To an action by respondent, filed December 18, 1951, for divorce, for support, and for custody and support of her two children, appellant answered February 4, 1952, with a general denial, and on June 13th in a supplemental answer he pleaded in bar that the District Court of the First Judicial District of Nevada had on March 27, 1952, granted him a final decree of divorce. The issues thus created were resolved by findings whereby the court below determined that (1) by reason of appellant's cruelties, respondent is entitled to a decree of divorce; (2) she is a fit and proper person to have the custody and care of her children; (3) appellant is capable of supporting his wife and children on a high standard of living to which he had habituated them; (4) appellant had an annual income of $53,000 in 1951 from a trust held by the Security First National Bank of Los Angeles, and for 1952 it will be about $48,000; (5) he is a life beneficiary of such trust fund; (6) he is capable of paying for the support and maintenance of respondent and her children and for reasonable compensation to the attorneys of respondent and necessary costs of suit and expenditures incurred in the protection of the interests of respondent and her children; (7) respondent is without sufficient funds with which to maintain herself and children or to pay reasonable compensation to her attorney and others contributing to the prosecution of her cause and to pay the necessary costs and money necessarily expended and debts incurred by respondent during the pendency of this action and to June 15, 1952, in the sum of $1,450.96. Other findings will appear in the discussion.

Because the findings declare and the judgment decrees that appellant took steps in bad faith to make Nevada his permanent home, his first ground for a reversal is that "Defendant's Nevada Divorce Decree Was Entitled to Full Faith and Credit."

In support of such proposition appellant cites *Williams* v. *North Carolina*, 325 U.S. 226 [65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366]; *Hinderlider* v. *LaPlata River & C. Creek Ditch Co.*, 304 U.S. 92 [58 S.Ct. 803, 82 L.Ed. 1202]; *Baldwin* v. *Baldwin*, 28 Cal.2d 406 [170 P.2d 670]; *DeYoung* v. *De-Young*, 27 Cal.2d 521 [165 P.2d 457]; *Murphy* v. *Travelers Ins. Co.*, 92 Cal.App.2d 582 [207 P.2d 595]; *Lowe Corp.* v.

*Rasmusson,* 53 Cal.App.2d 490 [127 P.2d 1002]; 2 Nelson, *Divorce and Annulment* (2d ed.) 499; Keenan, *On Residence and Domicil,* 457. Such authorities in general terms uphold certain statements of appellant made in his attempt to overcome the findings of fact and to discredit the adjudication of his bad faith. But under a cold analysis, it is clear that they are inapplicable to the findings or to the evidence in the record.

The good faith of a spouse who migrates to a sister state for the purpose of obtaining a divorce is a question of fact and he who asserts the invalidity of a decree thus gained has the burden of proof. Respondent accepted the burden and produced a generous quantity of evidence in support of her contention. Appellant was born in Los Angeles County. He was reared and educated there, and there resided, voted, married, established a home, and became the father of two children. His only bank account prior to his sudden flight to Nevada was maintained in Pasadena and his only income was from a trust administered in the city of Los Angeles. He told neither his wife, nor his mother nor his children of an intention to live in Nevada. In fact, he told no one but a crony in cups of his plan. He departed with a few personal effects, leaving his utility accounts and his safety deposit box in his own name. On his arrival in Reno he telephoned his wife he disliked the cold and would remain but a short time, and caused his attorney in that city to notify respondent that he was in the divorce capital because of marital difficulties.

But appellant was not alone or lonely in the new place. He was there attended by one ''Lucille'' who was bent upon a kindred mission. She resided with appellant in the same apartment, used the same attorney to get a divorce that represented her consort in his far-flung venture, and he supplied her with clothes and otherwise maintained her. But evidently aiming to make a record of events that would establish his good faith residence, before leaving he resigned from the Pasadena golf club where he never played; at increased expense he changed his membership in the California Club of Los Angeles to ''non-resident'' status. In Reno he procured a chauffeur's license; registered his automobile, paid a personal property tax in the amount of $8.90 and a poll tax in the sum of $3.00. He registered as a voter but never exercised his right of franchise, leased an apartment at $85 per month and opened a bank account with $200 but never drew a check. He did tell some of his witnesses in Reno he was

to make Reno his permanent home. He established no business or place to transact his affairs but received his mail at the office of his Reno attorney. Such facts and others to be mentioned are sufficient to warrant the finding that appellant's claim of having "established a new residence for himself in the State of Nevada after December 15, 1951, is sham and fictitious . . . said Nevada residence . . . being merely colorable and designed to invoke the jurisdiction of the Nevada courts . . . was simulated or pretended and for the purpose of obtaining a divorce, and . . . with the intention to leave Nevada when he accomplished such purpose. No bona fide domicile was established in Nevada by either of the spouses."

Under the findings, then, appellant was still a domiciliary of California at the time he commenced his action for divorce in Nevada. His activities ostensibly designed to establish the good faith of his residence were not conducted with a sincere intent; also, the circumstances under which they were performed are such as to warrant the finding that they were dishonestly designed to identify appellant with Nevada and, therefore, are not sufficient to effect a change of domicile. (Civ. Code, §§ 150, 150.1, 150.2.) *

It is equally established by the record that respondent was domiciled in California at the time the Nevada action was commenced and continues to be so and did not participate therein or file a personal appearance.

█ From the language of the cited code sections it is evident that the Legislature conceived that when a divorce decree is certified from Nevada, the full faith and credit clause is not necessarily applicable until a compliance with the requirement of due process has been shown. However, inasmuch as appellant bases his claim to a reversal primarily upon the ground that full faith and credit was not extended to his Nevada

---

*Civil Code:

Section 150. This article may be cited as the Uniform Divorce Recognition Act.

Section 150.1. A divorce obtained in another jurisdiction shall be of no force or effect in this State, if both parties to the marriage were domiciled in this State at the time the proceeding for the divorce was commenced.

Section 150.2. Proof that a person hereafter obtaining a divorce from the bonds of matrimony in another jurisdiction was (a) domiciled in this State within twelve months prior to the commencement of the proceeding therefor, and resumed residence in this State within eighteen months after the date of his departure therefrom, or (b) at all times after his departure from this State and until his return maintained a place of residence within this State, shall be prima facie evidence that the person was domiciled in this State when the divorce proceeding was commenced.

decree, exploration of that topic is indispensable to a complete disposition of this appeal.

▪ A defendant in a Nevada divorce action is at liberty to attack collaterally the decree so long as he did not participate in the case or make a personal appearance. (*Estin* v. *Estin*, 334 U.S. 541, 549 [68 S.Ct. 1213, 92 L.Ed. 1561, 1568, 1 A.L.R.2d 1412].) But if he did participate in the Nevada action or if he was personally served, the defendant is inhibited from making a collateral attack upon the decree. (*Coe* v. *Coe*, 334 U.S. 378, 384 [68 S.Ct. 1094, 1097, 92 L.Ed. 1451, 1459, 1 A.L.R.2d 1376]; *Sherrer* v. *Sherrer*, 334 U.S. 343, 351 [68 S.Ct. 1087, 1097, 92 L.Ed. 1429, 1436, 1 A.L.R.2d 1355]; *Johnson* v. *Muelberger*, 340 U.S. 581 [71 S.Ct. 474, 95 L.Ed. 552, 556].) The case of Sherrer suffered a unique fate. Even though both parties participated in the Florida action, the Massachusetts court held it was not entitled to full faith and credit because neither party had established a Florida domicile. But it is not pertinent to a consideration of the attack upon the judgment obtained by appellant in Nevada. ▪ Not only did respondent not visit Nevada during the pendency of the action there, but she did not make a legal appearance in the case. She is therefore not barred from attacking appellant's decree. Appellant has industriously attempted to support the validity of his Nevada judgment by citing certain decisions that rejected attacks upon foreign divorce decrees. The leading authority invoked in his support is *Baldwin* v. *Baldwin*, 28 Cal.2d 406 [170 P.2d 670]. That decision did, in truth, reject the attack upon the Nevada decree for the reason that the trial court determined as a fact that Mr. Baldwin did sincerely intend to remain in Nevada. That finding was the very backbone of the judgment and protected it from a collateral attack. He had waited three and a half months to file action after his arrival in that state. This appellant's hesitation after his six weeks had expired did nothing to increase the glamour of his good faith in the matter of establishing his long residence. ▪ The law is established that the bona fides of the galloping litigant in search of a forum wherein to seek a divorce is a question of fact. (*Marshall* v. *Marshall*, 69 Cal.App.2d 20, 23 [157 P.2d 854].) That fact herein was found adversely to appellant. Also, appellant cites *Gildersleeve* v. *Gildersleeve*, 88 Conn. 689 [92 A. 684, 686, Ann.Cas. 1916B 920]; *Colburn* v. *Colburn*, 70 Mich. 647 [38 N.W. 607, 608]. Both decisions held nothing more than that the good faith of an actual change of residence to another state, with

the intention of remaining there was not affected by the migrant's motive to procure a divorce. Moreover, appellant quotes at length from 2 Nelson, *Divorce and Annulment, supra,* and Keenan's *On Residence and Domicile.* The substance quoted merely declares fundamental principles inapplicable where the mala fides has been determined by the trial court.

On the contrary, the holdings are legion that the foreign decree is not entitled to full faith and credit where a spouse has taken *pro forma* steps to leave the domicile of his lifetime, ascertains the names of lawyers in the new jurisdiction that might best serve him (*Hall* v. *Hall,* 199 Miss. 478 [24 So.2d 347, 349]); or becomes infatuated with another woman, resigns from lodge affiliations and applies in the new state for a position as teacher (*Cox* v. *Cox,* 137 N.J.Eq. 241 [44 A.2d 92, 96]); or where a husband's conduct indicated that he had gone to Florida for the sole purpose of obtaining a divorce (*White* v. *White,* 150 F.2d 157, 158; *Evans* v. *Evans,* 149 F.2d 831]; or where the defendant had gone to the new state and secured a divorce in violation of a temporary injunction issued in the home state, like appellant herein, told no one on his departure of his intention to establish a domicile beyond the borders of his domiciliary state (*Streitwolf* v. *Streitwolf,* 181 U.S. 179, 183 [21 S.Ct. 553, 45 L.Ed. 807, 810]); or where the defendant leaves his home in New Jersey where his wife's action for divorce is pending and in Florida alleges only acts that had occurred in the state of his matrimonial domicile (*Mascola* v. *Mascola,* 134 N.J.Eq. 48 [33 A.2d 864, 866]).

In *Roberts* v. *Roberts,* 81 Cal.App.2d 871 [185 P.2d 381], although the wife had, while under the dominance and direction of her husband, gone to Reno where she employed the attorney specified by him and was duly granted a collusive decree of divorce, it was held (1) to be the duty of California courts to forbid interference with the status of its own citizens and to prevent the dissolution of a marriage by the decree of a court of a sister state that had no jurisdiction; (2) "this state is a party to every marriage contract of its own residents as well as the guardian of their morals"; and (3) a divorce granted by a Nevada court "without first having pursuant to its own laws acquired jurisdiction over one of the parties is a void decree." That decision is a variant from *Heuer* v. *Heuer,* 33 Cal.2d 268 [201 P.2d 385], in which the Nevada decree was given full faith and credit because the wife had freely and of her own accord actively participated in the Nevada pro-

ceedings. In *Marshall* v. *Marshall, supra,* the husband had gone to Nevada while a divorce action was pending in California. His conduct before and after arriving in Nevada proved to be contrary to that of a bona fide resident. Because his residence was attempted in bad faith, his Nevada decree was nullified. Such are the morals and the law that the courts of this state will continue to reject a foreign divorce decree "in any case where it is apparent that the tourist plaintiff cocked one eye askance at the examining justice while solemnly swearing intention to remain permanently in the divorce forum state and with the other eye anxiously watched the courtroom clock in nervous concern about catching the afternoon train 'back home.'" (Justice Sicher in *Standish* v. *Standish,* 179 Misc. 564 [40 N.Y.S.2d 538, 546].)

In addition to the vices of the Nevada decree discussed above, appellant must be reminded that not only did he know that he was restrained from proceeding with his action in the district court of Nevada, but also, in the course of the proceedings before that court an affidavit was read into the record to the effect that Mr. Huntington had been restrained from proceeding with the action.

### ATTORNEYS' FEES

■ At the hearing on the order to show cause, the court ordered appellant to pay counsel for respondent $6,000 "on account in connection with legal services heretofore rendered and now contemplated to be rendered by said attorneys, and the sum of Fifteen Hundred Dollars ($1,500.00) for court costs, the employment of Nevada counsel, investigators, and the like, and in connection with all costs incurred to date by virtue of operations in this case connected with the State of Nevada." The order then proceeds to provide for the installment payment of such sums which was subsequently modified by reducing the monthly payments from $500 to $350.

Appellant now contends that the court intended by its order to provide that $6,000 should be the total attorney's fee to be paid for work to be done in the future ("now contemplated") as well as for "services heretofore rendered." He argues that not only was no proof made of the extent of such legal services, but no request was even made at the trial by respondent's lawyers for additional fees. Such contention is directly contrary to the holding in *Hellman* v. *Hellman,* 108 Cal.App.2d 588 [239 P.2d 458]. The order made a year prior to judgment and before the defendant had answered directed the latter to "pay the plaintiff's attorney forthwith the sum of

$200 on account of counsel fees.'' It was held that by such order the court granted the plaintiff's application in part and ''reserved for later determination the question whether a larger sum should be awarded.'' Pursuant to the reservation, the court after trial awarded payment of $200 in addition to any sum theretofore paid. Such holding was in accord with *DeVall* v. *DeVall,* 102 Cal.App.2d 53, 58 [226 P.2d 605], where the court at the hearing of the order to show cause directed Mr. DeVall to pay his wife $200 on account of attorney's fees . . . balance, if any, pursuant to determination at the time of trial.'' In *Nelson* v. *Nelson,* 100 Cal.App. 2d 348 [223 P.2d 636], the trial court reserved ruling on plaintiff's motion for ''additional attorney's fees.'' When the trial was finished the court found as a fact that the sum of $100 was a reasonable sum to be awarded for additional attorney's fees. From the cited decisions and others and from the general practice of courts in actions where counsel fees of one party are to be paid by the other, it is customary with trial courts frequently to defer the act of determining the full amount to be paid, but to reserve such decision for the court to make after observing the amount of service performed before appraising its value. After the court has by implication allowed partial payment on account and thereby reserved jurisdiction to determine the entire amount at the conclusion of the trial, the court does not thereby lose jurisdiction to make such determination. (See Civ. Code, § 137.) The phrase ''on account'' could have no other reasonable meaning than that the allowance of $6,000 would be supplemented if the services actually rendered should justify a further award.

## ALIMONY

The court fixed $1,000 per month as alimony for respondent and $600 per month for support of the two boys, an annual total of $19,200 out of his gross income of about $50,000. Inasmuch as the trial court is vested with wide discretion in making such orders, in view of the evidence appertaining thereto, it cannot be said that the award is grossly excessive. Appellant admitted that $1,250 per month would be a fair allowance. While his annual income is around $50,000, aside from the instant judgment he has no serious outlay to reduce it save that of federal taxes and from the testimony of his tax expert ''if no alimony were paid he would have to pay to the government federal income tax of $23,318. If he paid alimony of $17,400 per year, his federal income tax would be only $11,385.50, in other words, almost half.''

Based on an income of $50,000 and no deductions, appellant would have to pay about $25,000 for federal income taxes. But in the situation presented, after $12,000 is deducted for alimony payments, the federal income tax payable on $38,000 would be about $17,000, leaving him about $21,000. After a payment of $7,200 for the support of his sons, he has $13,800 for his personal living expenses under the present judgment.

Out of her $12,000 paid under the judgment, respondent will have to pay about $3,000 federal income tax. It appears that the family group now has a total of $30,000 for its support compared with $25,000 prior to the divorce, and that appellant now has for himself alone more than half of his old income which supported the entire family.

#### MISCELLANEOUS ASSIGNMENTS OF ERROR

Appellant complains that the court had no jurisdiction to split his separate income or to divide his property; or to impose a lien on his income. He says because his trust is administered in Los Angeles County where "all manner of writs of enforcement are available to plaintiff, the administration of the trust is unnecessarily interfered with by the alleged lien." The answer to such complaints is that only by the imposition of a lien upon his separate estate to secure the enforcement of the judgment can there be economic security for the wife and children. Were appellant's estate not under the lien imposed by the court, it might be alienated by assignment or attachment.

The right of appellant to visit his children is not "unnecessarily interfered with." After hearing all the evidence of appellant's misconduct, and having had opportunity fairly to appraise respondent's character, it cannot be said that the court abused its discretion in requiring one day's notice in advance of his calling to see the children.

Complaint is made of "numerous errors in the admission of evidence." Such errors are not set out in a brief but only references to the reporter's transcript are provided. From his manner of suggesting some 28 errors, it must be assumed that none of them is prejudicial.

Judgment affirmed.

McComb, J., and Fox, J., concurred.

A petition for a rehearing was denied November 6, 1953, and appellant's petition for a hearing by the Supreme Court was denied December 17, 1953. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.